250 F.2d 253
 James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,
v.
LUBLIN, McGAUGHY & ASSOCIATES, a co-partnership, and Alfred M. Lublin, John B. McGaughy, William T. McMillan and William Marshall, Jr., individually and doing business as Lublin, McGaughy and Associates, Appellees.
 No. 7488.
 United States Court of Appeals Fourth Circuit.
 Argued October 23, 1957.
 Decided November 25, 1957.
 
 Bessie Margolin, Asst. Sol., United States Department of Labor, Washington, D. C. (Stuart Rothman, Sol., Eugene R. Jackson, Attorney, and Jeter S. Ray, Regional Attorney, United States Department of Labor, Washington, D. C., on brief), for appellant.
 Robert C. Nusbaum and Alan J. Hofheimer, Norfolk, Va., for appellees.
 Before PARKER, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 The Secretary of Labor brings this suit under the Fair Labor Standards Act, as amended,* against Lublin, McGaughy and Associates, a co-partnership, and against the individual members of the firm who are architects and engineers with a main office in Norfolk, Virginia, and a branch office in Washington, D. C. The complaint charges that the defendants have violated various sections of the statute, in that they have employed many persons in interstate commerce and in the production of goods for interstate commerce for workweeks longer than forty hours without compensating them for the excess hours of employment at rates not less than one and one-half (1½) times the regular rates at which they were employed, in violation of §§ 7 and 15(a) (2) of the statute; and in that they have failed to keep adequate records of their employee's wages and hours and other conditions — as prescribed by the Federal Regulations — in violation of §§ 11 (c) and 15(a) (5) of the Act; and in that they have transported goods in interstate commerce, in the production of which many of their employees had been employed, in violation of § 7 of the Act. An injunction was prayed restraining the defendants from further violation of the statute. The District Judge, after hearing, denied the relief prayed, resting his decision in large part on the conclusion that the plans and specifications prepared by the firm were not "goods" within the meaning of the Fair Labor Standards Act.
 
 
 2
 The principal questions to be considered grow out of the contentions of the Government: (1) that the drawings, plans and specifications prepared by the employees of the firm are "goods" and that the preparation thereof is "production of goods for commerce" within the meaning of § 3 of the statute; and (2) that the employees of the firm who participated in interstate travel and communications required for the conduct and co-ordination of the firm's offices in Norfolk and Washington were "engaged in commerce" within the meaning of § 7(a) of the statute; and (3) that a large part of the work of the firm's draftsmen, fieldmen and clerical employees is so closely related to projects for the improvement, expansion or replacement of interstate instrumentalities as to bring them within the "in-commerce" coverage of the Act. The Government recognizes that employees engaged in a professional capacity are exempted by § 13 of the statute, but seeks to bring the non-professional employees of the firm within the coverage of the Act.
 
 
 3
 The defendants, who reside in Norfolk, are architectural and consulting engineers. They have worked and are now employed on numerous projects in Virginia, Maryland and the District of Columbia, and have worked on some projects in North Carolina and overseas. They include, primarily, projects for the improvement, enlargement and repair of installations at military bases, airfields, shipyards and radio stations for the United States military services, and also a substantial number of state and municipal undertakings and projects. These activities require constant co-ordination and communication, as well as transmission of information and materials between the two offices. In general, the defendants collect the necessary data for the projects, confer with their clients in regard thereto, and prepare the drawings, estimates and surveys which are used in connection with the projects. They also supervise and inspect the construction from an architectural and engineering standpoint by furnishing surveying and engineering services to contractors while construction is in progress.
 
 
 4
 To perform this work the defendants have about thirty employees in the Norfolk office and twenty employees in the Washington office, including architects, engineers, draftsmen, fieldmen, office managers, stenographers and bookkeepers. This action is concerned only with the nonprofessional employees consisting of draftsmen, fieldmen, clerks and stenographers.
 
 
 5
 In the course of the business necessary surveys and topographical maps are made and then the draftsmen, working under the supervision of the engineers and architects, prepare the drawings and designs from which blueprints are reproduced. The drawings, together with explanatory specifications, contain the information necessary for estimating the cost, financing the project, the bidding of contractors, and guidance to the contractor in constructing the project. The military, governmental and commercial structures on which the defendants are now and in recent years have been engaged are intricate in design and construction and could not be constructed without the plans and specifications prepared by the employees, many of which are transmitted across state lines. They consist of physical material of negligible value in itself, though, as copies of the master drawings, they contain information which may be of substantial value to the particular client in the construction of the project and in planning subsequent alteration and repair. It is estimated that on the average one-half of the charges of the defendants for their architectural and engineering services is for work upon the master drawings and specifications and in the development of information embodied in them.
 
 
 6
 The plans, specifications and estimates prepared for government agencies, which comprised the greater part of the defendants' work, are submitted to these agencies and become their property. Frequently numerous copies of the specifications and drawings are required. The advertisement of a proposed government project results in requests for sets of plans and specifications from out-of-state contracting firms and these are sent by the Government to the prospective bidders to enable them to prepare and submit bids. When required by the terms of the contract the defendants furnish copies of the specifications and drawings which are reproduced by an outside blueprint company. For commercial clients copies of the drawings and specifications are furnished while the originals are retained by the defendants in case additional copies are needed. These copies are also obtained from commercial blueprint establishments at an additional cost to the clients.
 
 
 7
 The fieldmen include surveyors, transit men and chain men who work under the supervision of a professional engineer. They survey boundaries, take borings, etc. at the work site, frequently traveling from the District of Columbia to the site in Maryland and returning to the defendants' office in Washington in connection with their duties. They have little or no duty in the office but gather the material and bring it to the office as a basis for the preparation of the drawings and specifications. Some of the field work was done on projects for the Washington Suburban Sanitation Commission located in Maryland to which a large part of the time of the firm's Washington office has been devoted for the period of a year. A survey party reports to the Washington office each morning, drives to Maryland with the necessary field books and field equipment, makes surveys and gathers data, which is brought back to the Washington office at the end of each day and turned over to the draftsmen. For approximately 50 per cent of their commercial clients, for whom a minor part of defendants' work is performed, the defendants supply employees who supervise the construction of the project so as to determine whether the construction is proceeding in accordance with the plans and specifications. An additional charge is made for this type of work.
 
 
 8
 Projects for the improvement or repair of interstate instrumentalities on which the defendants have worked include airfields and airplane facilities for which streets are widened or constructed, hangars are repaired or altered, and extensions are built. Radio and television facilities are relocated, repairs to government buildings at shipyards and machine shops are made, and other work in Maryland, Virginia and North Carolina is constructed.
 
 
 9
 Stenographers type letters, specifications and other documents, some of which are mailed to points out of the state. Some of the employees handle telephone calls, and some of those calls are from and to localities out-of-state. Payroll data for employees in the Washington office is mailed bimonthly to Norfolk where payroll checks are prepared and returned to Washington through the mail. Employees of the bookkeeping department, who prepare vouchers for the payment of bills of the defendants, prepare those for out-of-state as well as local creditors.
 
 
 10
 We consider first the contention of the Government which goes to the heart of the case, that the plans, drawings, specifications and blueprints prepared by the non-professional employees of the defendants are "goods" within the meaning of § 3(i) of the Act where the term is defined as "goods, * * * wares, products, commodities, merchandise, or articles or subjects of commerce of any character." The District Judge held to the contrary, following the decision in McComb v. Turpin, D.C.Md., 81 F.Supp. 86, where, as in the pending case, an injunction was sought to prevent violation of the statute by architects and consulting engineers. One of the contentions of the Government was that the mere preparation of plans intended to be sent by mail, express or messenger to a client in another state constitutes production of goods for commerce. On this point, Judge Chesnut said (at pages 88 and 89):
 
 
 11
 "* * * This can be true only if the definition of the word `goods' as contained in the Act is construed to cover the preparation of the plans, drawings and specifications referred to in the stipulation. The definition [§ 203(i)] defines `goods' to mean `goods * * * wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof'. I do not think even this broad literal definition could fairly be construed to apply to the plans, drawings and specifications prepared by or under the supervision of the defendants or their employees. They are only a physical embodiment in words of professional conclusions.
 
 
 12
 * * * * * *
 
 
 13
 "Certainly the word `goods' could not be construed to include professional advices and its definition should not be construed to include the typewritten or mechanical expression by which the advice is given. These plans, drawings and specifications are not themselves the subject of barter or sale, but only the written embodiment of professional advice, and incidental thereto. They are specifically prepared to meet the particular problem of a specific client and are not sold or offered for sale to the public generally. They are, of course, quite unlike stocks, bonds and commercial paper which are themselves instrumentalities of commerce. Bozant v. Bank of New York, 2 Cir., 156 F.2d 787. This distinction was well made by Circuit Judge Learned Hand in the case just cited, 156 F.2d at page 789 as follows:
 
 
 14
 "`Some of the activities which went on, we agree, should on no theory be counted. A lawyer who in the course of his practice writes letters, or draws deeds or wills, or prepares briefs and records, is not on that account within § 203(j); and the same is true of the correspondence of a broker and of a banker. The definition of "goods" in § 203 (i) might literally go so far even as that; but it would be unreasonable to the last degree to suppose that Congress meant to cover such incidents of a business whose purpose did not comprise the production of "goods" at all.'"
 
 
 15
 The Department of Labor cited this decision in its Interpretative Bulletin, Part 776, Subpart A, General (May, 1950), Title 29, Chapter V, Code of Fed. Reg. (776.19(b) (2)), where it said:
 
 
 16
 "On the other hand, the legislative history makes it clear that employees of a `local architectural firm' are not brought within the coverage of the Act by reason of the fact that their activities `include the preparation of plans for the alteration of buildings within the state which are used to produce goods for interstate commerce'. Such activities are not `directly essential' enough to the production of goods in the buildings to establish the required close relationship between their performance and such production when they are performed by employees of such a `local' firm."
 
 
 17
 We are now told, however, that this pronouncement is no longer tenable because of the decisions of the Supreme Court in Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414 (January 8, 1945), and Powell v. U. S. Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (May 8, 1950). In the Western Union case [323 U.S. 490, 65 S.Ct. 341] the Supreme Court held that telegraph messages are "goods" within the meaning of § 203(i) because they are "subjects of commerce", one of the terms in the inclusive list enumerated in the section. In the course of the opinion, the Supreme Court noted that in Western Union Telegraph Co. v. Pendleton, 122 U.S. 347, 7 S.Ct. 1126, 1127, 30 L.Ed. 1187, in declaring invalid a statute which attempted to regulate the activities of telegraph companies, it had held that intercourse between the states by telegraph messages amounts to interstate commerce in the transportation of "ideas, wishes, orders and intelligence". This holding, it is now said, demonstrates that the embodiment of ideas contained in plans and specifications are also "goods" within the meaning of the Act.
 
 
 18
 The Powell case held that munitions manufactured by a private contractor at a government plant were "goods", and that his employees were engaged "in the production of goods for commerce". [339 U.S. 497, 70 S.Ct. 759] Munitions were held to be "goods", because they were "products" within the meaning of § 203(i) of the statute; and the employees were held to be engaged in the production of "goods" for commerce, although the munitions were not to be sold but used in the war, because of their "transportation" to destinations outside the state.
 
 
 19
 We do not think that these decisions require us to abandon the conclusion reached by Judge Chesnut and by Judge Hoffman in the pending case. The Department of Labor itself did not give this effect to the Western Union decision of 1945, notwithstanding the holding therein that the transportation of ideas embodied in tangible form may amount to commerce between the states. On the contrary, it issued its Bulletin in 1950 following the lines laid down by Judge Chesnut. The practical distinction between the business of interstate communication by telegraph and the activity of making plans and drawings which are used merely as guides for building construction, is so obvious as not to deserve further discussion. Nor does the Powell case support the Government's position. It does show that the term "goods" in § 203(i) of the statute is not limited to those bought and sold, but its holding that munitions of war are "goods" in no way tends to show that such articles as plans and specifications, which possess markedly different characteristics, are also "goods" in the statutory sense.
 
 
 20
 The defendants in this case were independent engineers and architects engaged in essentially local activity in each of the offices which they maintained. They were not employed to manufacture documents to be sold or transported in interstate commerce but to give professional advice and assistance which of necessity was given permanent form as plans or specifications so as to be available for guidance and reference. Clearly such plans were not "goods" in the ordinary case, although it is possible to conceive a situation in which standard plans or blueprints for building construction might be prepared for transportation or sale in such a way as to fall within the coverage of the Act. That, however, did not happen here. The copies of the plans that were made and sent out for the convenience of the clients and their bidders were not transported as subjects of commerce but in order to show the interested parties the sort of construction that was required; and the mere fact that the documents crossed state lines did not alter their inherent nature.
 
 
 21
 The second contention of the Government is based on the interstate travel and communication of the employees of the firm between its two offices and between these offices and the locations of its out-of-state clients and their contractors. It is said that these activities constitute engagement "in commerce" even though the plans and specifications are not "goods" produced in commerce within the meaning of the Act; and many cases are cited in which the Courts have found that the transportation of documents and records as well as the travel of employees from state to state are forms of interstate commerce which subject the participants to regulation by Congress. Thus the Courts have pointed out that the use of the mails and other facilities of interstate commerce perform an important, if not a vital function in the operation of businesses which extend beyond state boundaries, e. g., a holding company in control of corporations operating in seventeen states, North American Co. v. S. E. C., 327 U.S. 686, 694, 695, 66 S.Ct. 785, 90 L.Ed. 945; the production and presentment of theatrical attractions on a multistate basis, United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279; the business transactions across state lines of a fire insurance company, United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; the business of conducting schools by means of correspondence through the mails from state to state, International Text Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678; Federal Trade Commission v. Civil Service Training Bureau, 6 Cir., 79 F.2d 113; and the business of communications itself by use of the telegraph, Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414, and by newspaper, Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. Similar rulings involving the Fair Labor Standards Act have also been made where interstate communication was not the principal or direct aim and necessity of the enterprise but, nevertheless, performed an important function. Thus in Donovan v. Shell Oil Co., 4 Cir., 168 F.2d 229, it was held that a clerk who prepared payroll checks mailed to employees in different states and kept personnel and statistical records in the office of an oil company concerned with the interstate transportation of petroleum products was engaged in commerce; and in Durkin v. Joyce Agency, D.C.N.D. Ill., 110 F.Supp. 918, 923; Mitchell v. Joyce Agency, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740, that clerks and switchboard operators employed by a warehouse corporation concerned with interstate transportation who used the telephone and mails in carrying on the business were engaged in interstate commerce, and in Aetna Finance Co. v. Mitchell, 1 Cir., 247 F.2d 190, that employees of a loan company whose operation involved a constant flow of documents, information, etc. through the mails were engaged in interstate commerce. The transportation of persons from state to state in the course of business operations may also constitute interstate commerce, Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119; Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442; Hemans v. United States, 6 Cir., 163 F.2d 228, 239; Cleveland, Utah v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12.
 
 
 22
 It is manifest however, notwithstanding this well established line of authority, that the mere use of the mails and of transportation facilities across state lines is not necessarily interstate commerce. There must be some relation to a business which is interstate in character. This is found most clearly where the very essence of the business is interstate commerce itself, as in the sending of telegraph messages, and it also exists where the employer's business is interstate in character, as illustrated above, in the course of which interstate communication is a material part. But where the business is essentially local and there is no production of "goods", communication which is merely incidental to the local enterprise cannot be classed as commerce. The inter-office communication in this case related to the local production of plans and specifications, and the fieldmen who travelled from state to state were sent out to get the information as to the character of the work to be done, so that the architects and engineers might do their preparatory work. All of these activities related to the production of plans, partook of their intrastate character, and cannot be fairly characterized as commerce between states.
 
 
 23
 Finally, the Government contends that it should prevail because the work of certain draftsmen, fieldmen and clerical employees relates to projects for the improvement, enlargement and repair of instrumentalities of interstate commerce, for the most part military installations, airfields, shipyards and radio facilities for the United States, as well as municipal governmental projects such as turnpikes and road improvements, and projects for private enterprise such as was done in the remodeling of Trailways Bus terminals in Washington and in Baltimore. Undoubtedly the term "in commerce" covers not only the activity of workers who share directly in the work of construction but also those who do the paper work, such as the preparation of lists of material or payrolls, or who serve as fieldmen and timekeepers on the job. In some cases there is reference to the preparation of plans or drawings for construction work by employees of the contractor as evidence that work "in commerce" is being performed. See Laudadio v. White Const. Co., 2 Cir., 163 F.2d 383, 386; Ritch v. Puget Sound Bridge & Dredging Co., Inc., 9 Cir., 156 F.2d 334, 337; Archer v. Brown & Root, Inc., 5 Cir., 241 F.2d 663, 668; Chambers Const. Co. v. Mitchell, 8 Cir., 233 F.2d 717, 723; Mitchell v. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196. There is, however, no clean-cut holding that the work of employees of independent architects, such as are before us in this case, is "commerce" under the Act.
 
 
 24
 It may be that the activities of the employees in question constitute an indispensable link in the chain of causation whereby instrumentalities of commerce are extended or improved; but it does not follow that their work is so closely connected with interstate commerce as to be a part of it. In determining the question, the character of the work of the employees rather than the occupation of the employer is the controlling factor, but the occupation of the employer must nevertheless be taken into consideration, for the Act does not attempt to regulate local activity. This is most clearly shown by contrasting the decision of the Supreme Court in Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865; with its decision in 10 East 40th St. Bldg. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, which were decided on the same day. In the first case it was held that the maintenance employees of a building owned and chiefly used for central offices by an interstate producer were within the regulated area as persons engaged in an occupation necessary to the production of goods for commerce; but in the second case it was held that employees doing the same kind of work in a metropolitan office building operated as an independent enterprise and used by every variety of tenants, including producers of goods for commerce, did not have such a close and immediate tie with the processes of production as to be covered by the Act. The Court said, 325 U.S. 583, 65 S.Ct. at page 1229:
 
 
 25
 "* * * Mere separation of an occupation from the physical process of production does not preclude application of the Fair Labor Standards Act. But remoteness of a particular occupation from the physical process is a relevant factor in drawing the line. Running an office building as an entirely independent enterprise is too many steps removed from the physical process of the production of goods. Such remoteness is insulated from the Fair Labor Standards Act by those considerations pertinent to the federal system which led Congress not to sweep predominantly local situations within the confines of the Act. To assign the maintenance men of such an office building to the productive process because some proportion of the offices in the building may, for the time being, be offices of manufacturing enterprises is to indulge in an analysis too attenuated for appropriate regard to the regulatory power of the States which Congress saw fit to reserve to them. Dialectic inconsistencies do not weaken the validity of practical adjustments, as between the State and federal authority, when Congress has cast the duty of making them upon the courts. Our problem is not an exercise in scholastic logic."
 
 
 26
 The partners in the pending case may be likened to the owners of the general office building in the Callus case. They did work for a general miscellany of clients in connection with construction projects, some of which were local in nature while others were such that the construction workers themselves were within the coverage of the Act. But the architectural work itself was local and of necessity gave color to the activities of their subordinates and took them outside the scope of the statute. It is this element which the Government and the decision in Mitchell v. Brown, 8 Cir., 224 F.2d 359, upon which the Government relies, seem to ignore. For these reasons we do not think that the employees of the defendants were subject to the provisions of the statute. This is not to say that some employees of the firm may not have participated so actively at the site of construction as to be covered; and nothing in this decision is intended to preclude further proceedings as to them. There is however no sufficient showing of the nature of their activities in the record in this case as to justify the issuance of an injunction.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Act of June 25, 1938, ch. 676, as amended by the Fair Labor Standards amendments of 1949, ch. 736, 29 U.S.C.A. § 201 et seq