UNITED STATES of America
v.
Odie SEAGRAVES, Appellant.
No. 12683.

United States Court of Appeals
Third Circuit.

Argued Feb. 19, 1959.

Decided April 29, 1959.

Vincent M. Casey, Pittsburgh, Pa. (Margiotti & Casey, Vincent M. Casey, Pittsburgh, Pa., on the brief), for appellant.

Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa. (Thomas J. Shannon, Asst. U. S. Atty., Western District of Pennsylvania, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant was convicted after a lengthy trial under an indictment charging him and others with conspiracy to transport in interstate commerce certain geophysical maps, knowing the maps to have been stolen. He was sentenced to pay a fine of $5,000 plus costs of prosecution. He appeals the denial of his motion for judgment of acquittal. 18 U.S. C. § 371 (1952) as pertinent reads:

> "If two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined * * * or imprisoned * * * or both."

The offense against the United States required by the general conspiracy statute above quoted is in this case set out by 18 U.S.C. § 2314 (1952, amended 1956):

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud * * * [s]hall be fined * * * or imprisoned * * * or both." [1]

The evidence supplied to us reveals that one Milner, who was indicted as a co-conspirator but who had not been apprehended, obtained the maps involved from Smith, an employee of Gulf Oil Corporation. Smith had free access to the company's geophysical and geological maps at Pittsburgh and out of spite for the company wrongfully supplied copies of a number of these to Milner in Pittsburgh on five or six occasions. He first did this in the spring of 1955. Most of the maps, however, were delivered in the last two or three months of that year and in January 1956. On the visits subsequent to the first Milner indicated to Smith by telephone the areas of which he wanted maps.

In August or September, 1955, James Suberbielle, an oil broker in Houston, Texas, who had formerly been associated with Milner in some business venture, took Milner to see defendant Seagraves. Milner had already been introduced by Suberbielle to the defendant Lester, who was a business associate of Seagraves and who was also convicted at the trial below. At the meeting where Milner, Suberbielle, Lester and Seagraves were present Milner produced four Gulf geophysical maps on which the company's name did not appear. After some discussion it was agreed that Lester and Seagraves would purchase the maps from Milner for $2,500 each, plus a 1/16 override in any successful wells brought in in the areas involved. Suberbielle was thereupon employed to obtain leases in

the Louisiana area with which at least one of the maps was concerned. Sometime thereafter Suberbielle and Lester made a trip to New Iberia, Louisiana, in an attempt to obtain leases. They took along one of the Gulf maps which was of that area. In the attempt to arrange leases, Seagraves' name was given as the principal in the proposed transactions. About December 1955, back in Houston, Suberbielle happened to meet Seagraves who said that he had sent Milner $10,000. Some three or four hours later Suberbielle was with Milner when Lester appeared and paid over $6,900; he said he would have the rest for Milner in a few days. Milner thereupon proceeded to display an assortment of geophysical maps in which Lester immediately evinced interest. This, however, determined Suberbielle to sever his connection with the defendants.

Shortly after this Seagraves went to Cuba. Lester and Milner subsequently visited him there in February, 1956. During this visit Seagraves obtained from Milner a receipt for monies received from Lester and Seagraves. A copy of this was obtained from Seagraves by Leivia in November, 1956 in New York, at which time Leivia was secretly co-operating with Gulf Oil Corporation toward recovery of the maps. This record showed payments totaling $14,635 made on eleven occasions between November 22, 1955 and February 22, 1956. Three of these payments totaling $1,645 were indicated as received directly from Seagraves. Leivia, incidentally, had been brought into all this around March, 1956 when he was employed by Lester with the hopes that he could help arrange financing. Leivia's suspicions of the business were aroused when on a trip to Casper, Wyoming he talked with a Gulf representative who, in the course of their conversations, produced a map

1. 18 U.S.C. § 2: "(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal. "(b) Whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such."

identical with the one which Leivia had brought with him from Texas and which Lester had furnished him.

At the same time Leivia obtained the receipt from Seagraves he sounded out the latter as to his knowledge of the maps and their origin. It was plain that Seagraves knew, at least at this time, that the maps had come from the Gulf Oil Corporation. Further, there was nothing in this conversation that would indicate Seagraves had not known from the beginning where the maps had come from.

Appellant cites United States v. Crimmins, 2 Cir., 1941, 123 F.2d 271, wherein Judge Hand pointed out that to be guilty of conspiracy the participants must have intended to effect every element of the offense against the United States. It is asserted that the evidence here does not indicate any intention on appellant's part concerning the element of transportation of the maps between states. In urging this, however, appellant assumes that the conspiracy was over as soon as the maps had arrived in Houston from Pittsburgh. Were this the case perhaps there would not be sufficient evidence to indicate appellant's knowledge of what place the maps had originally come from, and hence he could not have intended that there be any interstate transportation of them.[2]

Yet the language of the indictment [3] would indicate that the conspiracy for interstate transportation of the maps was alleged to have continued well after the maps had arrived in Houston, for they are alleged also to have been taken to New York and to other unknown places outside of Pennsylvania. The overt acts specified in the indictment allegedly occurred at various times from January 2,

1956 through December 18, 1956, the date the maps were recovered through the arrest of some of the defendants. Appellant was sufficiently charged by the indictment with participation in a continuing conspiracy to transport stolen maps interstate. We find no variance between the facts alleged in the indictment and those in evidence upon which the conviction rests.

■ Thus, if any maps were taken out of Texas with Seagraves' acquiescence after he had tentatively agreed to buy them, knowing that they were stolen property, the offense charged in the indictment would be made out. The trip by Lester with Suberbielle to New Iberia, Louisiana, was made after Seagraves and Lester had agreed to purchase the map which went along to New Iberia in Lester's possession. It is permissibly inferable that Seagraves knew about and intended this interstate transportation of this particular map. It is also inferable that it was intended by all of the participants that any of the maps should be transported to the areas depicted in order to facilitate the operations being conducted by the alleged conspirators in those areas. It follows that one means toward the ends sought by the venturers was the transportation of the maps to their respective sites of operation. At the very least this was a tacitly agreed upon and understood incidental of the venture. Paraphrasing language from Pereira v. United States, 1954, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435, it is clear that an intent to make use of the maps would include an intent to transport them in interstate commerce. Seagraves therefore could also be chargeable with intending interstate transportation from Texas to Wyo-

---

2. The fact that on Milner's visits to Smith subsequent to the first one he specified areas in which he was interested strongly indicates that either Lester or Seagraves or both of them knew where the maps were being obtained and were in fact causing particular maps to be taken.

3. " * * * the said defendants * * * did conspire together and with each other

* * * to transport * * * certain geological or seismographic maps of the Gulf Oil Corporation in interstate commerce *from Pittsburgh*, in the State of Pennsylvania, *to Houston*, in the State of Texas, *and to New York*, in the State of New York, *and to divers other places* to the Grand Jurors unknown * * *." (Emphasis supplied.)

ming and back of the map which Leivia had with him when he saw the identical map in the hands of Gulf's representative at Casper. We have in this case what was lacking in the Crimmins case; here it was understood to be a part of the project that the maps should cross state lines.

Moreover, from reading the district court's opinion it would seem that had a full transcript of the trial been provided we could cite other instances evidencing appellant's intention with respect to interstate transportation of the maps. Less than five per cent of what was estimated would be a three thousand page record has been transcribed for this appeal. In connection with this observation it might be noted that, as we read his brief, appellant makes no contention concerning sufficiency of the evidence for concluding he knew the maps had been stolen. Such knowledge is a necessary element of the offense under § 2314. Even if this point had been raised we could not pass upon it in the present abbreviated state of the record. See Gallarelli v. United States, 1 Cir., 1957, 248 F.2d 539.

Appellant further claims that whatever offense may have been committed was not within the ambit of 18 U.S.C. § 2314 because the maps were not, in the language of the statute " * * * goods, wares, merchandise, securities or money * * *" nor was it shown that they had a market value of $5,000 or more.

■■ The terms "goods, wares, merchandise" is a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce. Black's Law Dictionary, 4th ed. 823 (1951); 1 Bouv. Law Dict. Rawle's Third Revision p. 1365 (1914). There was evidence that maps of the type here involved are frequently sold; there was also expert testimony (other than by Gulf people) which placed the value on some of the individual maps alone at well over $5,000. Since the maps were shown without doubt to be subjects of commerce, albeit of a specialized nature, they are goods or wares or merchandise within the terms of the Act. Cf. Western Union Telegraph Co. v. Lenroot, 1945, 323 U.S. 490, 502, 65 S.Ct. 335, 89 L.Ed. 414. We would distinguish the reasoning in Mitchell v. Lublin, McGaughy & Associates, 4 Cir., 1957, 250 F.2d 253, reversed on other grounds, 1959, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed. 2d 243, by pointing out that the blue prints, plans, and specifications were, as the court said, the permanent form into which was cast the advice and assistance for which the defendants were consulted. Those plans and drawings were never sold separately and alone as were the maps in this case.

■ If we understand appellant's contention concerning failure of proof as to the value of the maps, it is that these maps were of particular value only so long as their information was not generally known and available. He says there was no showing that the information had not been generally available. The testimony of Smith as well as the very fact that defendants paid as much as they did for the maps negate this contention and furnish the assumption on which the maps were valued by the expert testimony with a sound basis in fact.

■ Appellant's last point is that the venue for the trial was improper. 18 U.S.C. § 3237 (1952, amended 1958) provides that an offense against the United States committed in more than one district may be prosecuted in any district where the offense was begun, continued, or completed. This completely answers appellant's contention as there was satisfactory proof of commission of acts at Pittsburgh in furtherance of the conspiracy with which appellant was shown to have been connected.

The judgment of the district court will be affirmed.