**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Morris Paul WEINSTEIN, a/k/a Morry Weinstein, Defendant–Appellant.**

**No. 86–1225.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1987.

Decided Dec. 22, 1987.

As Amended March 3, 1988.

---

Kathryn A. Oberly, Mayer, Brown & Platt, Washington, D.C., for defendant-appellant.

Charles B. Burch, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before HUG, NELSON and NOONAN, Circuit Judges.

HUG, Circuit Judge:

The criminal charges in this case arose out of the defendant's participation in the preparation and filing of a bankruptcy petition for a travel agency and his dealings with the assets of that agency before and after the filing of the petition. Weinstein was convicted on one count of conspiracy to commit bankruptcy fraud, three counts of bankruptcy fraud, and two counts of causing transportation of stolen property in interstate or foreign commerce. Specifically, he was convicted of inducing the making of false statements in the debtor's bankruptcy petition, of fraudulently trans-ferring and concealing assets of the travel agency before and after the filing of the bankruptcy petition, and of conspiring to commit both crimes. He was also convicted of causing others to transport stolen airline tickets in interstate or foreign commerce.

The principal issues raised on appeal are:

1. Whether the proof established that the assets allegedly transferred or concealed were property of the debtor's estate;

2. Whether the district court committed plain error by failing to give an instruction to guide the jury in determining what constituted property of the debtor's estate;

3. Whether the evidence was sufficient to support the convictions;

4. Whether the indictment should have been dismissed because some records had not been preserved by the bankruptcy trustee;

5. Whether airline tickets that have been filled in with the names of the passengers are "goods, wares [or] merchandise" within the meaning of 18 U.S.C. § 2314;

6. Whether the airline tickets that formed the basis of the charge under 18 U.S.C. § 2314 had a value of at least $5,000, as required by that statute; and

7. Whether it was plain error to order, as a condition of probation, the restitution of $72,984.33, which Weinstein contends exceeds the actual damages or loss occasioned by the offenses of which he was convicted.

## I.

### FACTS

In 1975, appellant Weinstein, a lawyer and an accountant, helped to incorporate a travel agency known as Professional Travel Consultants, Inc. The original shareholders were Carter, Schueler, and Lucas. In 1977, Downs purchased an interest and, thereafter, each of the four owned a 25% interest in the corporation. On January 22, 1979, Weinstein entered into a purchase

agreement with Carter, Schueler, and Lucas to purchase their 75% stock interest in the corporation. Downs retained his 25% interest. Carter, Schueler, and Lucas also assigned their interest, from the purchase agreement with Weinstein, to Downs, for application to a debt they owed to Downs. Weinstein was intending, in turn, to transfer 75% of the stock he acquired, 25% to each of three business associates. The escrow on the sale was to close on January 31, 1979, if the required state and federal government agency approvals were obtained; if not, the escrow agent was to keep the stock, money, and other documents in escrow until such approvals were obtained. The agreement provided that if the approvals were not obtained by May 2, 1979, either Weinstein or the sellers could terminate the agreement. The agreement also provided that in the event of a termination the sellers agreed "to immediately reimburse" Weinstein for any advances made to Professional Travel Consultants, Inc. by Weinstein. The escrow did not close on either of the dates specified, or any time thereafter.

After the execution of the agreement, Weinstein advanced money to the travel agency and assumed the role of president and supervisor of the overall operations of Professional Travel Consultants, Inc. In August, 1979, Weinstein filed a change of ownership form with the Air Traffic Conference of America ("ATC")[1] in which he was specified as the president and one of the owners (along with the three business associates) of Professional Travel Consultants, Inc. This change was approved in November of 1979.

In August of 1981, he formed a new corporation, Pro Tra Co., which then became the vehicle through which the travel agency was operated. From a practical standpoint, Pro Tra Co. took over the assets and assumed the liabilities of the travel agency, although the legal formalities were apparently not followed. The name on the front door was changed from Professional Travel Consultants, Inc. to Pro Tra Co., d/b/a Professional Travel Consultants. The stationery of Professional Travel Consultants, Inc. was used, but personnel were directed to strike out the "Inc.," so as to reflect the d/b/a of Pro Tra Co. The same bank account of Professional Travel Consultants, Inc. was still used, without alteration. Essentially, the new corporation simply took over the business of the travel agency, utilizing the same name of Professional Travel Consultants, the same office, and the same personnel. The name, Professional Travel Consultants, Inc., continued to be used with ATC because no transfer approval was obtained as required. Thus, Pro Tra Co. was doing business with ATC under the name of Professional Travel Consultants, Inc., as though no change in ownership had occurred. Weinstein contends that the new corporation was owned by an employee, Greifeld, who was to pay for the business out of future profits. No purchase agreement was ever produced and the testimony of the existence of even an oral understanding was indeed vague. There was considerable testimony and documentary evidence that during the entire time, from 1979 to the filing of the petition in bankruptcy, Weinstein was clearly the man in charge and that he treated the travel agency as his own.

In late May, 1982, Weinstein and Greifeld, the office manager, decided to close the travel agency, and all employees were terminated. On June 4, 1982, Weinstein and Greifeld consulted with an attorney, Dauphin, about filing a bankruptcy petition, and they were given a blank petition form to be used as a rough draft for the bankruptcy petition. The form was returned to Dauphin by Greifeld on June 7, 1982. The first three pages of the draft were in Weinstein's handwriting. The petition, based on the draft, was filed June 8, 1982. The name of the debtor designated

---

**1.** The ATC is a corporation jointly owned by 24 airlines of the United States and it serves as the authorizing entity and regulator of travel agents in the United States (RT 819–20). The ATC also is responsible for issuing and controlling blank airline tickets and ticket validation plates as well as the collection of monies due from ticket sales (RT 820–21). The ATC is presently called the Airlines Reporting Corporation, or "ARC."

in the petition was "Pro Tra Co., a corporation doing business as Professional Travel Consultants."

In the portion of the petition designated "Statement of Financial Affairs for Debtor Engaged in Business," the following questions were asked and responses given based on the draft in Weinstein's handwriting:

*Question 1(a)*

Under what name and where do you carry on your business?

*Response*

Professional Travel Consultants, Inc., doing business as Professional Travel Consultants Pro Tra Co.

*Question 1(b)*

In what business are you engaged?

*Response*

Travel agent

*Question 1(c)*

When did you commence such business?

*Response*

August 1981

The schedules to the petition showed $6,590.00 in assets and $173,601.11 in liabilities, the latter including $140,000 owed to the Air Traffic Conference.

The bankruptcy petition and the draft prepared by Weinstein stated that Greifeld was the sole shareholder and director of the debtor and that no third person had in his possession any item of value in which the agency had an interest. The petition was signed by Greifeld as the president and sole shareholder of the debtor.

Shortly before the petition was filed, Weinstein took a $14,155 check from BP Alaska Exploration, Inc., payable to Professional Travel Consultants, Inc., for airline tickets purchased from the travel agency, and deposited it to his personal bank account. Two days before the business was closed, Greifeld drew funds out of the travel agency bank account and purchased two cashier's checks totaling $11,000 made payable to Stranflower Investments and Valhalla Company. These checks were deposited by Weinstein in a Merrill, Lynch trad-

ing account in his name. On the same day, Weinstein wrote a check to the agency for $8,386.48 for airline tickets.

In late May a stock of blank airline tickets was delivered to Walfrin Oberlin, Weinstein's neighbor, who ran another travel agency. These tickets were validated with a plate of Professional Travel Consultants, Inc. and sold over a period of time. The airlines were not paid for the tickets and the Government contended that the proceeds of the sales were divided between Weinstein and Oberlin. The Government estimated that the proceeds from these tickets exceeded $40,000. Weinstein also gave a number of tickets to friends for long flights to Europe and elsewhere, for which no payment was made to the ATC for the airlines.

Sixteen checks, having a total value of $984.33, made payable to Professional Travel Consultants for commissions from hotels and car rental companies, that were received after the bankruptcy petition was filed, were not turned over to the trustee but were deposited in Weinstein's personal bank account.

On August 29, 1986, Weinstein was indicted by a federal grand jury. On February 20, 1986, a superseding indictment was returned, charging Weinstein as follows:

Count One: Conspiracy to Commit Bankruptcy Fraud, a violation of 18 U.S.C. § 371 (1982);

Count Two: Bankruptcy Fraud, for transferring or concealing property of the debtor in contemplation of bankruptcy with the intent to defeat the provisions of the Bankruptcy Act, a violation of 18 U.S.C. § 152 (1982);

Count Three: Bankruptcy Fraud, for fraudulently concealing from the trustee property properly belonging to the estate of the debtor, a violation of 18 U.S.C. § 152 (1982);

Count Four: Bankruptcy Fraud, for aiding and abetting Greifeld in making false statements under oath in the bankruptcy petition, a violation of 18 U.S.C. §§ 152 and 2 (1982);

Count Five: Causing the Making of False Statements to a Government Agency, a violation of 18 U.S.C. §§ 1001 and 2 (1982);

Count Six: Mail Fraud, a violation of 18 U.S.C. § 1341 (1982);

Counts Seven through Nine: Wire Fraud, a violation of 18 U.S.C. § 1343 (1982);

Counts Ten through Thirteen: Interstate Transportation of Stolen Property (airline tickets), a violation of 18 U.S.C. §§ 2314 ands 2 (1982).

After a seven-week jury trial, Count Five was dismissed upon government motion, and Weinstein was convicted on Counts 1, 2, 3, 4, 10, and 13 (the conspiracy count, the bankruptcy fraud counts, and two of the counts charging the transportation of stolen property). He was acquitted on the remaining counts.

On August 5, 1986, Weinstein was sentenced concurrently, on the six counts of which he had been convicted, to five years in custody with all but six months suspended. Weinstein was placed on probation for the remainder of the five years. Weinstein was fined $5,000 on each of Counts 1, 2, 3, and 4, and $10,000 on each of Counts 10 and 13 (for a total of $40,000 in fines). Weinstein was ordered to pay $72,984.33 as restitution on the six counts of which he was convicted, and he was also ordered to pay costs of prosecution in the amount of $22,796.98. A timely notice of appeal was filed.

## II.

### BANKRUPTCY FRAUD PROVISIONS

■ Counts Two, Three, and Four of the indictment allege violations of 18 U.S.C. § 152. The pertinent provisions of the section that relate to these charges provide:

(First Paragraph) Whoever knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or from creditors in any case under title 11, any property belonging to the estate of a debtor; or

. . . .

(Third Paragraph) Whoever knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty [of] perjury as permitted under section 1746 of title 28, United States Code, in or in relation to any case under title 11; or

. . . .

(Seventh Paragraph) Whoever, either individually or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against him or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;

. . . .

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Count Two alleges pre-petition transfer or concealment of property of the debtor in violation of the seventh paragraph. Count Three alleges post-petition concealment of property belonging to the estate of the debtor in violation of the first paragraph. Count Four alleges that Weinstein aided and abetted Greifeld in making false declarations in the petition in violation of the third paragraph. The alleged false statements were that he was the sole stockholder of the debtor and that no third person was holding anything of value in which the debtor had an interest.

### A. *Property of the Debtor*

Weinstein's first and major contention on appeal concerning the bankruptcy fraud charges is that the Government failed to establish that the property allegedly transferred or concealed was the property of the debtor and belonged in the bankruptcy estate.

Frequently it is stated that the case argued on appeal scarcely resembles the case as it was presented in the trial court. The shift in emphasis by the defense in its arguments on appeal from those presented

in the trial court places this case in that category. The thrust of the defense in the trial court was that whatever wrongdoing was involved, it was the work of the office manager, Greifeld, or an associate, Oberlin, not Weinstein. On appeal, the thrust of the defense arguments is that the entity that was placed in bankruptcy was Pro Tra Co., a corporation owned by Greifeld, and that the property Weinstein is accused of transferring and concealing was the property of another corporation, Professional Travel Consultants, Inc., which was not in bankruptcy. Thus, Weinstein contends that no bankruptcy fraud could have taken place.

We therefore consider first whether there is sufficient evidence from which the jury could have found that the property transferred or concealed was that of Pro Tra Co. The evidence to support a conviction is sufficient if, reviewing "the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979), *quoted in United States v. Marabelles*, 724 F.2d 1374, 1377 (9th Cir.1984).

There was ample evidence that Weinstein treated the travel agency business as his own from 1979 on and that in 1981 he began operating the business under the corporate entity of Pro Tra Co. The petition, itself, shows that Pro Tra Co. was doing business as Professional Travel Consultants and also as Professional Travel Consultants, Inc. Pro Tra Co. had to use the name and prior authorization of Professional Travel Consultants, Inc. in its dealings with ATC because approval had never been obtained to issue tickets under the name of Pro Tra Co. As a matter of fact, even the continued operation of the agency under the name of Professional Travel Consultants, Inc. was through a misrepresentation to ATC, since the sale of the stock of that corporation to Weinstein had never been completed.

The bankruptcy petition listed as assets office furniture, a bank account in the name of Professional Travel Consultants, Inc., and accounts receivable of the travel agency business, which business had been carried on without differentiation from the time control was assumed by Weinstein in 1979. The petition also listed and sought discharge of the debts of the travel agency business that had built up over the years, including $140,000 owed to ATC for the airlines. Thus, we have a situation in which Weinstein took over a travel agency business, with its assets and liabilities, without observing legal formalities, and, again without observing legal formalities, continued operating that business, with its assets and liabilities, under the corporate entity, Pro Tra Co. He contends that Greifeld was the sole stockholder of Pro Tra Co., but in light of the substantial evidence of his involvement and the entanglement of assets and liabilities over which he had assumed ownership and responsibility, the jury was entitled to disbelieve him and conclude that he was the real owner.

Why Weinstein was allowed to take the travel agency as his own, without completing the sales transaction, is a matter of conjecture. Perhaps the clause requiring immediate repayment of all funds advanced by Weinstein was a deterrent to other claims to ownership. In any event, Downs was the assignee of all of the sellers' interest under the sales agreement, and he was the one entitled to complain about Weinstein's actions. It may be that Downs had, or may have, some claim against Weinstein as the assignee of the seller's interests under the purchase agreement and as the owner of the remaining 25% interest in the original corporation, whose business assets and liabilities were taken over by Pro Tra Co. Likewise, the three business associates who were to acquire an interest in the business may have some claim against Weinstein for any money they contributed. However, that does not preclude a finding that Weinstein had converted the business to his own use and subsequently transferred it to Pro Tra Co.

Weinstein, himself, concedes that "the bankruptcy proceedings went forward on the assumption that the travel agency business had been taken over and operated by

Pro Tra Co. and that the assets and liabilities relating to the business were those of that corporation." [Reply brief, p. 7] Although Weinstein contends that others may have had some claim to the assets, whether the assets in question were the property of the debtor and belonged in the bankruptcy estate was a question of fact for the jury.[2]

There was ample evidence to justify a jury's conclusion under the standard of *Jackson v. Virginia,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89, that Weinstein had taken over a travel agency with the express or tacit consent of the original owners; that he had operated it as his own for about three years at a loss and then in 1981 transferred the business to Pro Tra Co.; that he falsely showed Greifeld as the owner on the bankruptcy petition; that he sought the discharge of all of the debts of the business; and that the property he took · was the property of the debtor in the bankruptcy proceeding.

■ Weinstein argues on appeal that the district court committed error in failing to give *sua sponte* an instruction to guide the jury in determining whether the property allegedly transferred or concealed by Weinstein was property belonging to the estate of the debtor. Defense counsel did not object to the instructions on this subject or offer an instruction that gave any further explanation. When there has been no objection to the instructions as given, we will reverse only for plain error. *United*

*States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986). A failure to charge the jury on an "essential element" of an offense generally is plain error under Fed.R.Crim.P. 52(b) because it affects a defendant's substantial rights. *United States v. King,* 587 F.2d 956, 965–66 (9th Cir.1978).

In this case, the district judge carefully gave detailed instructions quoting the pertinent provision of the statute and explaining its terms. The terms of the statute itself are quite easily comprehended. The district court also added that the property transferred or concealed must belong to the bankrupt estate. This certainly charges on the "essential element" of the crimes. The most that the defendant can argue is that he now believes a fuller explanation of that element should have been made. If there was any error at all, it is clear that the district court's failure to clarify that element of the charge more fully was not plain error.

### B. Sufficiency of the Evidence on Count Two

■ The indictment charged Weinstein with knowing and fraudulent pre-petition transfer and concealment of a $14,000 check, $3,000 in net proceeds from the $11,-000 in cashier's checks, after deducting his check for about $8,000 and $40,000 in proceeds from the Oberlin ticket sales. Proof of either fraudulent transfer or concealment was sufficient; the Government did

---

**2.** The bankruptcy estate includes equitable as well as legal interests, 11 U.S.C. § 541. Weinstein's representations in the bankruptcy petition and his manner of dealing with the business assets would lead to a reasonable conclusion that the business assets were owned by Pro Tra Co. Courts have also upheld convictions for bankruptcy fraud where the defendant concealed the bankrupt's equitable interest in property. *See United States v. Moynagh,* 566 F.2d 799, 803 (1st Cir.1977) (defendant's failure to list equitable interest in boats that were legally owned by another company supported conviction for bankruptcy fraud), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1475, 55 L.Ed.2d 510 (1978); *In re Kaiser,* 791 F.2d 73, 77 (7th Cir.) (holding that land should be considered property of corporation's bankruptcy estate where principal held out land as corporation's property as far as creditors were concerned, despite fact that paper titles to the land were held by corporation's

owners), *cert. denied,* — U.S. ——, 107 S.Ct. 655, 93 L.Ed.2d 710 (1986); *United States v. Schireson,* 116 F.2d 881, 883 (3d Cir.1941).

Furthermore, the jury could have reasonably concluded that some or all of the assets in question were generated during the year that the business was conducted as Pro Tra Co. Pro Tra Co. effectively took over Professional Travel Consultants, Inc. in August of 1981, operating its day-to-day business for approximately one year prior to the filing for bankruptcy. Evidence at trial indicated that Professional Travel Consultants was not doing well financially before Pro Tra Co. took over. Therefore, the jury could reasonably have concluded that the money Weinstein withdrew from the travel agency account was money resulting from Pro Tra Co.'s operation of the agency. In addition, the small checks coming to the travel agency from commissions resulted from Pro Tra Co.'s efforts.

not need to prove both. Weinstein argues that there was insufficient evidence to prove the charge because the evidence showed that there was no criminal intent, that the transfers were in the ordinary course of business, and that there was no concealment because the checks were easily traceable, even though he failed to disclose them. Although there was evidence from which the defendant argued these theories to the jury, the jury was entitled to disbelieve these explanations. There was sufficient evidence from which the jury could have found the defendant guilty under the standard enunciated in *Jackson v. Virginia*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89.

### C. *Sufficiency of the Evidence on Count Three*

The indictment charged Weinstein with concealing from the trustee 14 checks belonging to the bankruptcy estate. Weinstein argues that the Government failed to prove that he knowingly and fraudulently concealed these checks from the trustee because there was evidence that he had them deposited into his trust account at Gibralter Savings & Loan for the payment of salary to Greifeld. The jury was entitled to disbelieve this evidence.

■■■ Concealment, for the purposes of 18 U.S.C. § 152, need not consist of secretly appropriating funds for one's own use. It is sufficient if one withholds knowledge of assets about which the trustee should be told. *United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir.1984). The fact that the person who conceals the assets does not directly profit from them does not change this result. *See Id.* at 1158–59. Under the standard enunciated in *Jackson v. Virginia*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89, there was sufficient evidence from which a jury could conclude that Weinstein intended to withhold information from the trustee concerning the checks in Count Three, and that these checks were, in fact, part of the estate of the debtor.

### D. *Sufficiency of the Evidence Under Count Four*

■ Count Four charged that Weinstein aided and abetted Greifeld in making false statements on the bankruptcy petition, in violation of Paragraph 2 of 18 U.S.C. § 152 and 18 U.S.C. § 2 (1982) (aiding and abetting). The alleged false statements were: (1) Greifeld was the 100% stockholder of Pro Tra Co.; and (2) no third person was holding anything of value belonging to Pro Tra Co., when, in fact, Weinstein was holding the items specified in Counts Two and Three.

As we discussed in section IIA there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Greifeld was not truly the 100% stockholder of Pro Tra Co. No evidence was produced that stock had ever been issued to Greifeld. The other evidence strongly pointed to the fact that Weinstein, in fact, owned the travel agency business and had simply not had the stock issued in his name. There was no sale agreement or any evidence of even a discussion of specific terms of sale with Greifeld. The jury was entitled to believe that the claimed ownership of the stock by Greifeld was a subterfuge, because there was adequate evidence to support that conclusion under the standard of *Jackson v. Virginia*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89. As discussed in the prior sections, there was also sufficient evidence under that standard for the jury to conclude that Weinstein held property belonging to the debtor.

### III.

### FAILURE TO PRESERVE EVIDENCE

■ Weinstein also claims that his convictions should be reversed because evidence crucial to his case was not preserved. Specifically, certain records relating to the travel agency's business transactions were turned over to the bankruptcy trustee by Weinstein. The records were accidently destroyed when the trustee changed offices. Weinstein moved for dismissal both before trial and before sentencing. The district court rejected both of the defendant's motions.

The factors that should be considered in this matter are the "'quality of the

Government's conduct and the degree of prejudice to the accused.'" *United States v. Roberts*, 779 F.2d 565, 569 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986) (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir.1979) (en banc) (Kennedy, J., concurring), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980)).

Here, the district judge made several factual findings. He found that there was no evidence that the government agents knew that the trustee had the records or had reason to believe the evidence would be destroyed. He also examined Weinstein's affidavit, which stated that Weinstein saw specific types of records during the time they were stored at his house. The judge found this statement to be unbelievable in light of his contradictory testimony on another occasion. He also found Weinstein's testimony—that he did not keep any secondary records of his large investments in the agency—to be incredible in light of Weinstein's training as a CPA and a lawyer. These findings were not clearly erroneous.

In the absence of any showing that the Government contributed to or condoned the destruction of records, and in the absence of any showing that Weinstein was prejudiced by the lack of any specific record, the denial of the motion to dismiss was clearly correct.

## IV.

### TRANSPORTATION OF STOLEN AIRLINE TICKETS

Counts 10 and 13 charged Weinstein with violating 18 U.S.C. § 2314, a provision of the National Stolen Property Act. This section makes it a crime to transport in interstate or foreign commerce any goods, wares, merchandise, securities, or money, of the value of $5,000 or more, knowing the same to be stolen, converted, or taken by fraud.

According to the evidence, Weinstein gave two pairs of round-trip airline tickets to his friends, Carl and Eleanor Kadie (Count 10) and Stuart Emery and Carol Augustus (Count 13), who used them to journey to Europe. The airlines were never paid for the tickets, and Weinstein was convicted of causing his friends to transport in interstate commerce "goods, wares [or] merchandise"—the tickets—that had been stolen, converted, or taken by fraud. The first question raised by Weinstein is whether filled-in airline tickets are "goods, wares [or] merchandise" within the meaning of 18 U.S.C. § 2314. Weinstein contends that the property designated as "goods, wares [or] merchandise" is limited to property that is ordinarily the subject of commerce. To support his argument, Weinstein relies upon *United States v. Greenwald*, 479 F.2d 320 (6th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 154, 38 L.Ed. 2d 104 (1973) and *United States v. Seagraves*, 265 F.2d 876 (3d Cir.1959).

We have held that "[i]n enacting section 2314, Congress intended ... to cover all stolen property over a certain value which is knowingly transported across state or international boundaries." *United States v. Whaley*, 788 F.2d 581, 582 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). We acknowledged in *Whaley* that some courts have indicated that the phrase "goods, wares [or] merchandise" is limited to property that is "ordinarily a subject of commerce." *Id.* at 582, *quoting Seagraves*, 265 F.2d at 880. However, this phrase has been given a broad meaning by those courts. The very opinions relied upon by Weinstein found stolen documents containing secret chemical formulations and stolen geophysical maps to be within the ambit of the act. *See Greenwald*, 479 F.2d at 321–22; and *Seagraves*, 265 F.2d at 880. Stolen blank airline tickets have been recognized as property that was within section 2314, *United States v. Gallipoli*, 599 F.2d 100, 103 (5th Cir.1979) as have stolen blank Ticketron tickets to concerts, *United States v. Moore*, 571 F.2d 154, 155 (3d Cir.), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978). It is apparent that if the property has value and can be sold, even on a thieves market, that it is considered to be "ordinarily the subject of commerce."

■ It is obvious that the airline tickets were valuable tangible property. The persons transporting them could use them, sell them to persons who could use them in an unauthorized manner, exchange them for other tickets more readily saleable, or obtain refunds. We hold that they were goods within the meaning of section 2314. The airline tickets are clearly property "ordinarily a subject of commerce" under the broad interpretations given this clause in our circuit and in other circuits.

■ Weinstein also argues that the tickets transported in Count 13 did not meet the $5,000 valuation requirement because the first tickets were taken before boarding the plane, and the remaining return tickets had a face value less than $5,000. On boarding the plane, however, the passenger receives a boarding pass, which entitles the passenger to continue to the destination. That boarding pass represents the value of the ticket taken and entitles the passenger to reach his destination. If the plane lands at intermediate stops or returns because of mechanical failure, the boarding pass represents the ticket taken and has the value of the passage to the ultimate destination. "[I]t is not necessary for the Government to show that the precise object stolen, converted, or taken by fraud be transported. It is sufficient if the item transported is directly derived from the property stolen, converted or taken by fraud." *United States v. Morgan,* 805 F.2d 1372, 1377–78 (9th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1612, 94 L.Ed.2d 797 (1987). Thus, the value of the ticket taken was represented by the value of the boarding pass transported.

We hold that the $5,000 jurisdictional amount was satisfied for an additional reason. The Third Circuit held that "the 'value' element of 18 U.S.C. § 2314 may be proved by evidence of the stolen property's value either at the time of theft or at the time of transportation." *Moore,* 571 F.2d at 156. The court reasoned that:

> [T]he National Stolen Property Act, of which both 18 U.S.C. § 2314 and § 2315 are a part, is aimed not only at discouraging the interstate transportation and receiving of stolen property, but also at deterring the original theft.... A valuation standard for § 2314 which looks to either the time of theft or the time of transportation is consistent with both these statutory aims, yet is not inconsistent with the governmental resource-preserving function of the $5,000 jurisdictional amount.

*Id.*

We agree with this reasoning and holding of the *Moore* opinion.

The face value of the tickets at the time they were taken by Weinstein exceeded $5,000, thus the jurisdictional amount is met.

## V.

### RESTITUTION ORDER

■ The Federal Probation Act, 18 U.S.C. § 3651 (1982), provides that district courts may require as a condition of probation restitution to "aggrieved parties for actual damages or loss caused by the offense for which conviction was had." Restitution may be required to aggrieved parties named or not named in counts for which probation is ordered provided that the indictment gives fair notice of the damages the Government intends to prove. *United States v. Van Cauwenberghe,* 827 F.2d 424, 434–35 (9th Cir.1987).

■ Weinstein contends that the court's restitution order of $72,984.33 as a condition of probation was excessive because it included $40,000 attributed to sales of airline tickets sold by Oberlin from the airline ticket stock of Professional Travel Consultants. The restitution amount was calculated from the evidence of losses suffered as a result of the crimes charged in Counts Two, Three, Ten, and Thirteen, of which Weinstein was convicted. The $40,000 amount was based on the conviction of bankruptcy fraud alleged in Count Two, which included three specific acts of fraudulent transfer or concealment of property belonging to Professional Travel Consultants. One of these involved "cash of at least $40,000 representing the proceeds of sales by Walfrin Otto Oberlin of airline

tickets from airline ticket stock provided to Professional Travel Consultants, a/k/a Pro Tra Co. by the Air Traffic Conference of America." The indictment gave fair notice, and the conviction on Count Two supports the order of restitution for the $40,000.

Weinstein argues that the $40,000 loss was dependent upon the testimony of Oberlin and that the jury must have disbelieved Oberlin because of the acquittal on the mail fraud and wire fraud charges relating to Oberlin's transactions. The acquittal on these charges could be for any number of reasons that would not be inconsistent with believing in Weinstein's complicity in selling the $40,000 of Professional Travel Consultants' tickets as alleged in Count Two. The verdict of not guilty merely means that the jury failed to find one of the substantive elements of those offenses, not that it disbelieved that Oberlin sold $40,000 of Professional Travel Consultants' tickets. *See United States v. Johnson,* 804 F.2d 1078, 1083 (9th Cir.1986). The conviction on Counts Two, Three, Ten and Thirteen justified the court's imposing requirements of restitution of the amounts specifically involved in those counts.

## VI.

## CONCLUSION

The judgment of conviction on Counts One, Two, Three, Four, Ten, and Thirteen, and the order of restitution is AFFIRMED.