**LANTERN PRESS, INC., Plaintiff,**

v.

**AMERICAN PUBLISHERS COMPANY, Defendant.**

**No. 73 C 1856.**

United States District Court,
E. D. New York.

Sept. 28, 1976.

Lawrence Fechner, New York City (Strassberg & Strassberg, New York City, of counsel), for plaintiff.

Guy I. Smiley, New York City (Smiley, Schwartz & Captain, New York City, of counsel), for defendant.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Plaintiff a New York corporation with its principal place of business in the Eastern District of New York, publishes, among other things anthologies of stories for younger people, each anthology being devoted to a special type of story such as ghost stories, outer-space stories, detective stories, and so on. Twenty-six of the published books are in issue here. All of them were copyrighted at first publication, and it is not denied that the twenty-six copyrights received in evidence as Exhibit 1 were validly issued copyrights and at the time this action was commenced were all in full force and effect and unexpired. The books at first publication were printed on paper of good weight and quality with wide margins and in hard-cover with what is styled in the industry Grade A library binding in heavy buckram. They were sold to the trade at $4.08. Plaintiff's sales of its books in hard-cover editions are directed first to all book buyers, and, after the first sales period and after the paperback edition has been authorized, continuing sales of plaintiff's hard-cover edition are directed to schools, libraries and other establishments in which books are subjected to hard use, particularly by younger readers, and have to be sturdy if they are to have a long circulation life.

Plaintiff's sales of its hard-cover edition are made to a substantial number of dealers to whom defendant has sold its hard-covered copies of the Pocket Books paperback reprint of the same books (as set forth later).

Commencing with a contract made on May 13, 1964, plaintiff has granted to Pocket Books, Inc. (later the Pocket Books Division of Simon & Schuster, Inc.) the rights to publish paper-bound editions of the twenty-six titles here in issue in English and to sell them at a retail price of 50¢ each throughout the world. The right is granted for a five year period. Plaintiff, in each contract, warranted that it had not granted to anyone any other rights to publish the book in volume form for sale at a retail price of less than $1 with the exception of sales to or through book clubs. Royalties were payable at the rate of 1¢ per copy on the first 150,000 copies sold and 1½¢ per copy on all copies sold thereafter; however those rates are based on the assumption that the retail price of the books would be 25¢; the rate was to be increased proportionately when the retail price was higher than 25¢. Under the contract it is provided that

"The Buyer agrees not to change the title or text of The Book without written permission from The Seller, except that The Buyer may, at his option, use or not use illustrations from the jacket or text of the trade edition provided such illustrations are the property of The Seller. The Buyer agrees to print on the verso of the title page of each and every copy of The Book which The Buyer may print the copyright notice supplied by The Seller, or, in the absence of special instructions, the copyright notice identically as found

in the copy of The Book furnished by The Seller. The Seller warrants that copyright validly exists in the exclusive territories covered by this agreement, that the same will continue unimpaired during the term of this agreement, and that it will be seasonably renewed prior to expiration thereof during said term."

Quite apart from the paperback rights granted to Pocket Books, plaintiff has from time to time sold unbound printers sheets of the texts of such books as are here in issue to Bound-to-Stay-Bound Books to be bound in hard covers of library quality by the buyers on the condition that they would be sold at a price of $4.08 or more.

The Pocket Book editions of plaintiff's stories are re-prints; they are in different type on a smaller page and on an inferior paper of lighter weight. However, they are complete reprints, although with a different title page arrangement and usually with a picture on the paperback cover that is original with Pocket Books. The book covers bear the line "A Lantern Press Book" with the Lantern Press symbol (a lantern on a book). On the title page above the line saying "Published by Pocketbooks. New York" appears the legend "A Lantern Press Book" with the Lantern Press symbol. On the copyright page the original title of the book is given and it is stated that the book is "A Lantern Press Book, published by Pocketbooks." At the foot of the page is the copyright notice, the copyright being that of Lantern Press, Inc. The next line reads "This Lantern Press Book is published by arrangement with Lantern Press, Inc."

Defendant bought the Pocket Book paperback reprints from Affiliated Publishers commencing in 1965 and continuing through 1974. In the year commencing April 1, 1973, defendant acquired 13,500 of the Pocket Books and sold 13,300 of them, destroying the last 200 after the commencement of the present lawsuit. The books were purchased from Affiliated Publishers at the regular discount from 50¢ of 46%. The purchase orders contained no restriction or limitation and Affiliated Publishers as distributors for Pocket Books imposed no conditions in its invoice based on the purchase orders.

Defendant did not resell the books as paperbacks. Rather, it "prebound" the books and sold them at prices varying from $1.96 to $2.11 each.

The expression "prebinding" requires a word of explanation. Libraries and, particularly, school libraries found over the years that hard usage of books in circulation required them to be re-bound, and beginning in the '30s a practice grew up of anticipating the need by re-binding new books that were not ruggedly bound in order to reduce the administrative expense, the overhead, involved in waiting until a poorly bound book broke down in service before going through the procedure for having it rebound. The practice became, that is, to have books pre-re-bound, if the original binding was flimsy or in the case of paperbacks was such as not to be suited to circulatory use. Some libraries did their own pre-binding, others contracted pre-binding out.

In the case of each of the twenty-six titles here in issue the defendant sold them as pre-bound books. Its practice was, when it got the paperbacks from Pocket Books, to detach the paper covers and after preparing a hard-cover backing and stitching heavy paper to the stripped-down paperback, the paperback text would be inserted into the case and glued or pasted securely into it. The picture cover of the paperback would then be trimmed and pasted to the front of the now hard-bound book. Nothing was altered in any way. Not a line of text was changed or added or deleted or modified. The legend on the reverse of the title page remained with its statement that "This Lantern Press book is published by arrangement with Lantern Press, Inc." and the cover of the book would show, as in the paperback itself, the statement at the top "A Lantern Press Book" with the Lantern symbol, and at the bottom a reference to the original title of the book as it appeared in plaintiff's hard-cover edition. The books were sold generally to libraries, schools, etc., through distributors. The books were

bound in C grade cloth rather than buckram.

Defendant did not at any time buy any books directly from plaintiff. The books that it bought from Affiliated Publishers were all regular copies of the paperbacks not in any way defective, defaced, or in need of repair. The sole purpose of preparing the kind of book that was prepared by the defendant was to extend the service life of the book and protect the text from destruction in use. At no time did defendant seek to buy the original publishers unbound sheets directly from plaintiff to bind for such library and school purposes.

Plaintiff did not learn that defendant was selling the paperbacks in pre-bound form until it saw the defendant's 1972 catalogue which at page 49 advertised the Lantern tales for sale to defendant's customers and pictured them. A similar advertisement appeared in the 1973 catalogue of defendant at page 51. Under date of July 24, 1972, plaintiff's counsel wrote defendant advising that Lantern had made contracts with the Pocket Books Division of Simon & Schuster for the publication of paper bound editions of twenty-six of its books at a price of 50¢ each and that it had come to plaintiff's attention that the books were being published and/or sold and distributed by defendant or its agents in a hard-cover format selling for $2.22 a volume. The letter continued, after suggesting a conference

"In the interim, demand is hereby made upon you, your agents, servants and/or employees, that you forthwith desist and refrain from any and all further violations of the contract of my client."

Plaintiff has no knowledge of any sales that defendant has made to customers of plaintiff who might have otherwise purchased library edition books from plaintiff, and does not know of specific instances of customers buying defendant's books in preference to plaintiff's own on price or other grounds, and knows of no specific instance of actual confusion as to the source of the book purchased by any customer.

Plaintiff's action, commenced on December 14, 1973, is for infringement of plaintiff's copyright and for unfair competition. Plaintiff's claim is that the defendant by its practice has created conditions conducive to passing off the goods of defendant's as the goods of plaintiff in that it has made a hard-bound library edition out of a paperback book and is selling those books to the same customers and for the same uses as plaintiff is endeavoring to sell its books, thus capitalizing on plaintiff's skills and investment.

It appears that defendant has entirely stopped selling the paperbacks in pre-bound form. It is agreed that defendant did continue to make sales of the book after the receipt of the July 1972 letter, but that defendant made no sale after 1974.

The questions presented are first whether there is any infringement of copyright on these facts and second, whether on these facts there has been any unfair competition.

1. Plaintiff raises in somewhat different form a recurrent question which has been thought to revolve around Section 1(a) and Section 27 of the Copyright Law (17 U.S.C. 1–216). Section 1 provides

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work; . . ."

And Section 27 provides

"The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of itself constitute a transfer of the copyright, nor shall the assignment of the copyright constitute a transfer of the title to the material object; but nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

■ Very broadly Section 1 can be thought of as providing that no copy of a copyrighted work can be sold unless sold by

the copyright owner or by his authority. A moment's reflection makes it clear, however, that if a copy of a work has been sold by the copyright owner or by his express licensee the purchaser of such a copy has the implicit authority to re-sell the work at his own price. On that self-evident proposition the whole publication industry is necessarily based. A work may pass from the publisher to a wholesaler to a retailer to a student to a second hand book store and so continue in circulation through countless sales each of which acts upon and grants an implied license under the copyright to make a further sale but all of which trace to the copyright owner's original sale of his copyrighted work.

■ Section 27 was directed to making clear the idea that the copyright was not identical with the copyrighted work but existed separately from it as the intangible right to exclude all others from printing, publishing, copying or vending the work. *Cf. Kings Row Enterprises, Inc. v. Metromedia, Inc.*, S.D.N.Y.1975, 397 F.Supp. 879. The last clause of Section 27 is evidently precautionary: the lawful possessor of a copy of a copyrighted work can transfer it to others—as can any book seller or customer of a book seller, for the transfers are in the regular and ordinary course of trade and trace back to a sale of that copy made by the copyright owner or under his authority.

■ The term "lawfully" as used in Section 27 means lawfully in respect of the copyrighted aspect of the work and not mere lawful, physical occupancy of the material on which the work has been printed. Judge Friendly made that very clear in *Platt & Munk Co. v. Republic Graphics, Inc.*, 2d Cir. 1963, 315 F.2d 847. Judge Friendly quoted from the House report of 1909 (made when Section 27 was first enacted as Section 41 of the earlier law) the following language:

> "The concluding clause in the section, that 'nothing in this act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a work copyrighted under this act the possession of which has been

lawfully obtained', is inserted in order to make it clear that there is no intention to enlarge in any way the construction to be given to the word 'vend' in the first section of the bill. Your committee feel that it would be most unwise to permit the copyright proprietor to exercise any control whatever over the article which is the subject of copyright after said proprietor has made the first sale."

■ In the present case Pocket Books was authorized by the copyright holder to publish the 50¢ edition. It is not claimed that there was any breach of the agreement between plaintiff and Pocket Books in the latter's selling to defendant regular, new copies of the books which they printed and published, at the 50¢ price less the standard trade discount. Defendant was then free to transfer as it would those copies of the copyrighted work that had come to its possession by lawful purchase from a vendor authorized by the copyright owner to make the sales. Defendant was free to sell his copies of the Pocket Books edition at any price he chose. *Cf. Bobbs-Merrill Co. v. Strauss*, 1908, 210 U.S. 339, 350–351, 28 S.Ct. 722, 52 L.Ed. 1086.

It is perfectly clear that by inserting the paperbacks in the hard-cover casing defendant materially improved the book. But defendant did not alter or modify or disturb any of the Pocket Books reprint of the text. No word was added or subtracted. Defendant sold the very copyrighted work which it had bought with the addition of a hard-cover casing.

The cases dealing directly with the sale at unexpectedly higher prices of such enhancements—in their uncopyrighted aspects—of a copyrighted work are clear that such sales do not constitute infringement. *Kipling v. G. P. Putman's Sons*, 2d Cir. 1903, 120 F. 631, held that there was no infringement where the defendant purchased from licensed publishers, new unbound copies of copyrighted books of the plaintiff's authorship and had them bound into sets which were given a distinctive set-name, and re-sold. Similarly *C. M. Paula Co. v. Logan*, N.D.Tex.1973, 355 F.Supp. 189, held that

there was no infringement where defendant bought plaintiff's copyrighted prints of art works—including greeting cards—and by the use of acrylic resin, emulsions and other compounds lifted the art work off the paper on which it was imprinted, thus transferring the art work to the resin film, and re-transferred the art work to ceramic tiles, plates and the like. The Court emphasized that defendant copied nothing, that he did not reproduce or duplicate the original or create a new copy. Said the Court (355 F.Supp. at 191):

> "Each ceramic plaque sold by defendant with a Paula print affixed thereto requires the purchase and use of an individual piece of artwork marketed by the plaintiff. . . . the process here in question does not constitute copying."

See also *Blazon, Inc., v. DeLuxe Game Corp.*, S.D.N.Y.1965, 268 F.Supp. 416, 420, 434; cf. *Burke & Van Heusen, Inc. v. Arrow Drug, Inc.*, E.D.Pa.1964, 233 F.Supp. 881 (sale of record in violation of a contract restriction on any resale of the record except as a premium on the sale of a shampoo *held* not an infringement).

■ The older cases are clear that the re-binding and sale of used or second hand books does not infringe the copyright of the author of the original work. The bellwether case is *Doan v. American Book Co.*, 7th Cir. 1901, 105 F. 772. There the defendant purchased a large number of used school text books, refurbished and re-bound them, and sold them as re-bound, in some instances reproducing the original covers in exact imitation of the original covers. The Court said (105 F. at 777):

> "To render these books serviceable for use or sale, it became necessary to clean them, to trim the edges of the leaves, and to rebind them. We think that, so far as respects the copyright laws of the United States, no legal right of the appellee was invaded by so doing."

However, to prevent unfair competition, the Court did require defendant to stamp on future books its name as the name of the one who had re-bound and reconditioned the book.

*Bureau of National Literature v. Sells*, W.D.Wash.1914, 211 F. 379, is to the same effect: there defendant bought secondhand copies of plaintiff's copyrighted books and after refurbishing them and re-binding them sold them as new sets. The Court held that there was no copyright infringement but retained the case (subject to an amendment of the complaint on the issue of damages) as an action for damages from unfair competition. *Fawcett Publications v. Elliott Publishing Co., Inc.*, S.D.N.Y.1942, 46 F.Supp. 717, was a case in which defendant bought secondhand copies of copyrighted comics and without removing the individual copyright notices bound them, together with secondhand copies of other copyrighted publications, under a single cover and sold them. Defendant copyrighted the new cover. The Court held that there was no infringement. It did not pass on the question of whether or not there might have been unfair competition.

While *Harrison v. Maynard, Merrill & Co.*, 2d Cir. 1894, 61 F. 689, has long been regarded as a leading case for the "first sale" proposition, it is a rather dubious case on the facts and may not have the vitality that it had before Judge Friendly's decision in the *Platt & Munk* case. It might well be argued that the abandonment, after a disastrous fire, of paper as worthless was hardly a transfer of a copyrighted work vesting a significantly "lawful" possession in the transferee. The Court, however, was certainly right in phrasing the question involved in these cases (61 F. at 690) in the form, "Can the owner of a copyright restrain, by virtue of the copyright statutes, the sale of a copy of the copyrighted book, the title to which he has transferred, but which is being sold in violation of an agreement entered into between himself and the purchaser; or are the remedies of the original owner confined to remedies for a breach of contract?" In *Independent News Co. v. Williams*, 3d Cir. 1961, 293 F.2d 510, the question was, again, really one of whether or not there had been any "first sale" by the copyright owner. There the books were never sold as books but, after their shelf-

life ended without sale, the owners tore off the covers and returned them to the next person up the line of sales distribution for full credit. It is implicit in the case that at no time did the copyright owner receive anything for any of the books. The persons who were left with the defaced copies of the books sold them to waste dealers and they in turn sold them to defendant who re-sold them as reading matter. The action violated one of the contracts governing the ultimate disposition of the "waste" books. The Court concluded, doubtfully on the facts, that there had been a "first sale" and that in consequence there was no infringement of copyright.

It is, however, on all of the cases, clear that there is no claim for infringement in this case. The copyright owner in ultimate effect gets only a royalty based on a 50¢ sale with respect to books sold for a price of about $2.00. But the seeming inequity is non-existent. The additional sales price is not a profit on the copyright but on the durability given the books through inserting them within boards. As the history of the practice of pre-binding makes clear, what occurs here does not differ at all from the re-binding of worn books to give them a new lease on life. The paperback is an obvious candidate for an anticipation of the need for early re-binding, with, apparently, a reasonable saving in administrative costs.

It may well be that plaintiff's hard-cover sales are notionally affected by the availability in the market of defendant's competitive volumes. But that has no bearing on the copyright issue. If it presents any problem it would be in the area of unfair competition.

2. No case of unfair competition has been made out. Plaintiff's evidence failed to show that any damages were sustained by plaintiff through defendant's sales. Plaintiff knew of no sales by defendant to its regular customers. Plaintiff knew of no case in which defendant's books had been confused with plaintiff's.

Plaintiff's claim of unfair competition is simply that defendant, by converting the paperbacks into a library edition, created a volume that could be sold to the libraries and schools which wanted sturdy copies of the plaintiff's book, and that such a competitive capability must have a tendency to reduce plaintiff's opportunity to sell its hard-cover edition to the same classes of customers. The argument, if supported in fact, would not suffice to make out a case.

The paperback contract with Simon & Schuster authorized a competitive edition of each book. Nothing prevented buyers of copies of the new edition from rebinding them to extend their life in use, nor prevented buyers from contracting out the work of rebinding. The paperbacks were regular articles of trade, and, when rebound, remained visibly paperbacks that had simply been rebound, retaining all the distinguishing marks of the paperback—the reduced page-size, the poor grade paper, and every other feature of the untreated paperbacks. They could not be mistaken for or confused with the original hard-cover edition. What occurred was one of the trade eventualities that plaintiff accepted when it made the paperback contracts with Simon & Schuster.

3. What has been said does not imply that a publisher making such contracts as Simon & Schuster made with plaintiff could itself directly or indirectly publish a hard-cover reprint. Such a right could only be derived from the license contract with the copyright owner. What has been said here applies to the rights of those who purchase paperbacks in the regular course of trade and elect to rebind them as defendant did in this case.

Judgment must therefore be for the defendant. It is

ORDERED that the Clerk enter judgment that plaintiff take nothing and that the action is dismissed on the merits with costs as taxed by the Clerk.