**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Raymond Joseph ATHERTON, Defendant-Appellant.**

**No. 76–1597.**

United States Court of Appeals, Ninth Circuit.

Sept. 19, 1977.

---

748

Gerald M. Singer, Los Angeles, Cal., argued for defendant-appellant.

Dominick Rubalcava, Asst. U. S. Atty., Los Angeles, Cal., argued for plaintiff-appellee.

Before CHAMBERS, KOELSCH, and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Atherton appeals from his conviction upon five counts of an indictment charging him with copyright infringement in violation of 17 U.S.C. § 104 and one count charging him with interstate transportation of stolen property in violation of 18 U.S.C. § 2314. He challenges the constitutionality of 17 U.S.C. § 104, contends that the evidence was insufficient to sustain the conviction, and argues that the court improperly excluded evidence. We uphold the constitutionality of Section 104, following *United States v. Wise* (9th Cir. 1977) 550 F.2d 1180, and reverse the conviction for insufficiency of the evidence.

Atherton bought, sold, collected prints of motion pictures. He advertised films for sale in catalogues. His customers were primarily motion picture collectors and dealers. The photoplays which are the subject of the copyright counts are "The Exorcist," "Airport," "The Way We Were," "Forty Carats," and "Young Winston." The copyrights were owned by Universal Studios ("Airport"), Columbia Pictures ("The Way We Were," "Young Winston," "Forty Carats"), and Warner Bros. ("The Exorcist"). Atherton had no license or any kind of permission from the copyright holders to use or sell the prints of these photoplays. He sold prints of the films at prices ranging from $135 ("Young Winston") to $500 ("The Exorcist").

Before *United States v. Wise, supra,* and *United States v. Drebin* (9th Cir. 1977) 557 F.2d 1316 [filed July 21, 1977] which came down while this appeal was pending, many of the issues on this appeal were open in the Circuit. *Wise* resolves almost all of the issues raised in respect of the copyright counts. Thus, the identical attacks on the constitutionality of Section 104 were decided against Atherton's challenges in *Wise*. *Wise* also established the five elements that the Government must prove in a Section 104 prosecution: (1) Infringement of a copyright, (2) of a work that has not been the subject of a "first sale," (3) done wilfully, (4) with knowledge that the copyrighted work has not been the subject of a "first sale," and (5) for profit. The Government adequately proved infringement, wilfulness, and profit, but it failed to negate first sale or to prove Atherton's *scienter*. The interstate transportation count (18 U.S.C. § 2314) was not involved in *Wise*, but that count was considered in *Drebin*. We overturn that count because, unlike *Drebin*, the Government failed to prove that the value of the print ("The Exorcist") was at least $5,000, the minimum valuation necessary to bring the acts within the statute.

## I

■■ Section 104 provides, in pertinent part: "Any person who wilfully and for profit shall infringe any copyright secured by this title, or who shall knowingly and wilfully aid or abet such infringement, shall be deemed guilty of a misdemeanor, . . . ." Although nothing in Section 104 specifically refers to "the first sale doctrine," that doctrine has been judicially read into the statute from a judicial gloss drawn on 17 U.S.C. § 27. As the *Wise* court explains: "[T]he first sale doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy. While the proprietor's other copyright rights (reprinting, copying, etc.) remain unimpaired, the exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy, even though in breach of an agreement restricting its sale." (*United States v. Wise, supra,* 550 F.2d at 1187.) The "sale" embodied in the first sale concept is a term of art. The sale is not limited to voluntary sales of a copyrighted work for a sale price that takes into account both the value of the materials upon which the copyrightable idea is affixed together with the idea itself. In this context, the first sale doctrine includes involuntary transfers, and as we shall explain later, sales of the copyrighted work for salvage, or other purposes unrelated to the transfer of the intangible creation or idea which is the subject of the copyright.

■ The Government tried to prove that the prints that Atherton sold could never have been the subject of a first sale because, under the distribution systems of each of the proprietors of the copyrights involved, the prints were never sold. The Government did not try to prove the source from which Atherton acquired any of the films. Rather, its theory was that if it could prove that no prints were subject to any first sale, it would follow that the prints that Atherton sold could not have been subject to a first sale. The Govern-

ment's theory was successful in respect of the film "The Exorcist." However, it failed to prove that there was no first sale with respect to the prints of the other films for which Atherton was prosecuted.

Here, as in *Wise*, employees of the motion picture studios who owned the copyrights testified, in substance, that the films were not sold, but rather licensed or used by licensees for limited purposes and for limited periods of time. Although none of the films in this case was subject to an outright sale, each of the films, other than "The Exorcist," had been the subject of transfers for television purposes that fall within the definition of first sale, as articulated and applied in *Wise.*

The first sale occurred in respect of "Airport" by reason of Universal's agreement with ABC Television Network. The transfer agreement provides "notwithstanding anything to the contrary contained in this subparagraph (e) or elsewhere in this Agreement, ABC may retain permanently, at ABC's election and cost, a print or recording of each Film for file, reference, and audition purposes." Here, as in *Wise*, this contractual provision clearly contemplates the sale of a film print to ABC at its election. No evidence was adduced at trial concerning whether ABC exercised its election, and in the absence of that proof, the Government failed to prove the absence of a first sale of the photoplay "Airport." The Columbia Pictures' contracts regarding "The Way We Were," "Young Winston," and "Forty Carats" contain a similar clause permitting ABC at its election and cost to retain a file-screening print. Consideration for the transfer of this library copy, the surrender of possession in respect of that copy, and Columbia's failure specifically to retain title together constitute a first sale.

The fact that Universal and Columbia made first sales of the prints that they transferred to ABC, of course, does not mean that any of the prints thus transferred were the source of Atherton's prints. The Government's proof failed because it made no effort to prove the source of Atherton's prints, relying entirely upon its the-

ory that no first sales had occurred to anyone. That theory collapsed upon proof that first sales were made to ABC. The Government's deficiency in proof thus compels reversal of all counts except the copyright count involving "The Exorcist."

Atherton also contended below, and here contends, that first sales had occurred by reason of the sales of worn-out prints to film salvage companies. The general proceedings of film studios in selling films for scrap are adequately described in the *Wise* and *Drebin* cases. *Wise*, however, did not have to decide whether a sale for salvage could be deemed a first sale in a prosecution for violation of Section 104. In *Wise* no evidence was introduced to rebut the testimony that the films there in question could not have been pieced together to create a feature-length motion picture from the products sold to film salvage firms. In Atherton's case, he tried to introduce evidence that at least one full-length feature motion picture had been recovered and sold by one of the salvage companies whose services were used by the copyright holders in this case. The district court sustained an objection based upon relevancy. The district court also rejected an offer of proof. If sale to a salvage company can be a first sale, the proffered evidence was relevant. The evidence was not offered to prove that Atherton acquired the prints that he resold from a salvage company, but rather to prove that first sales had occurred, thus tending to impeach the testimony of the prosecution witnesses that the films were never "sold."

In a criminal prosecution, a sale for salvage purposes can be a first sale. (*United States v. Drebin, supra.*) We recognize that authorities are divided on the question whether a sale to a purchaser with restrictions that are subsequently breached constitutes a first sale for copyright purposes in civil cases. In *Bobbs-Merrill Co. v. Straus* (1908) 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086, the defendant sold copies of a copyrighted work for less than one dollar, knowing that in doing so he had breached an agreement between the defendant's vendor and the copyright owner not to sell or to allow copies to be sold for less than one dollar. The Supreme Court held that any transfer of title is a first sale, and no copyright remedy is permissible to enforce the breach of contract involved. The same theory was followed in *Harrison v. Maynard* (2d Cir. 1894) 61 F. 689, in which a copyright remedy was foreclosed when a scrap dealer to whom the copyright holder had sold fire damaged, unbound book sheets to a book dealer in violation of the scrap dealer's express agreement to use them for scrap use only. *Harrison* was followed by *Independent News Company v. Williams* (3d Cir. 1961) 293 F.2d 510 (Comic books given to a salvage dealer for use as paper stock only were resold by the dealer in violation of the restricted use.). A different view was expressed, by way of *dictum*, in *Platt & Munk Co. v. Republic Graphics* (2d Cir. 1963) 315 F.2d 847, which can be labeled "the just reward" variation on the first sale doctrine. The theory is that a transfer equals a first sale, whether or not the transfer is involuntary, if the copyright proprietor has received a just reward for the use of his article. The theory was applied in *Lantern Press, Inc. v. American Publishers Co.* (E.D.N.Y.1976) 419 F.Supp. 1267, a case in which the defendant purchased paperbound versions of plaintiff's books and rebound them in hardback for sales to schools and libraries. The end product yielded the copyright holder a lesser return than it would have earned from an original hard cover edition, but the court concluded that there was no violation of the copyright because the copyright holder had received a just reward for the transfer. We do not think that the just reward theory should be imported into the first sale doctrine as incorporated into Section 104, upon which this criminal prosecution is based. Rather, we follow the trail left by *Bobbs-Merrill Co. v. Straus, supra,* to reach the conclusions of *Harrison* and *Independent News* and *United States v. Drebin, supra,* that a transfer to a salvage company for a consideration is a first sale in a Section 104 prosecution. The copyright holder is thus remitted to his civil remedies with-

out the potential deterrent force of a criminal prosecution against the vendee who has purchased copyrighted material sold to him by a vendor who violated restrictions on the transfer to him.

■ The Government successfully proved the absence of a first sale of "The Exorcist." The testimony was uncontroverted that "The Exorcist," at the time Atherton sold a copy of the print, had not been the subject of any television contracts, VIP contracts, armed service contracts, or airline contracts, and that no prints of the film had been sent to salvage companies. "The Exorcist" copyright count must nevertheless be reversed because the Government failed to prove that Atherton knew that no print of "The Exorcist" had been subject to first sale. The Government's failure to prove *scienter* in respect of each of these films is understandable because, until the decision in *Wise*, it was by no means clear that *scienter* was required. The Government did introduce evidence, strong enough to withstand an attack on appeal, that Atherton sold these prints intentionally and that he knew that sales in violation of the copyright law were illegal. But the evidence with respect to his knowledge of first sale, unlike the evidence in the *Wise* and *Drebin* cases, was slight. In view of the uncertain state of the law at the time this case was tried, no one can be faulted for the poor record. On retrial of this count, the Government should have an opportunity to cure the evidentiary deficiencies.

## II

■ Atherton's conviction for transporting a print of "The Exorcist" is violation of 18 U.S.C. § 2314 raises some interesting, almost metaphysical, legal issues. The most intriguing question is whether the intangible idea protected by the copyright is sufficiently reified by being embodied on a film that the copyright becomes "goods, wares, or merchandise" within the meaning of Section 2314. That question has been resolved against Atherton in *United States v. Drebin, supra.* Here, however, unlike *Drebin*, the Government failed to prove

that the property was worth $5,000. The only evidence that the Government offered to prove value was the box office receipts of "The Exorcist," as it was then being shown by authorized licensees in theatres. The Government offered no evidence to show that the 16 millimeter print of "The Exorcist" that Atherton sold could ever have been the subject of theatrical distribution. On the contrary, the evidence that it introduced for other purposes makes crystal clear that 16 millimeter print could not and would not have been shown to general public at theatres. The Government's evidence also showed that if one buys from a party other than the copyright owner, the most one can legally expect to get is the right to use the film privately and the right to resell.

Valuing a print in terms of the market value to film exhibitors who could not and would not have exhibited it, and who have licensing arrangements with the copyright owner, is incorrect.

The Government's reliance on *United States v. Lester* (3d Cir. 1960) 282 F.2d 750, is misplaced here. In *Lester* the court said "[W]here an exceptional type of goods that has no market value is the subject matter of the indictment, any reasonable method may be employed to ascribe an equivalent monetary value to the items." (*Id.* at 755.) The principle is sound (*United States v. Drebin, supra* ), but it has no application to this case. It does not validate the unreasonable method that the Government employed. Moreover, there was evidence that there was a market for film prints, including this one. Film collectors testified at the trial that they had paid various prices for copyrighted films, none of which approached the $5,000 required valuation. We need not decide whether a valid market can be created from sales of pirated films for two reasons: (1) A legitimate market for copyrighted films was proved, and (2) even if an illegal market cannot be used and there was proof that no legal market for private sales of "The Exorcist" existed, that weakness in Atherton's proof, if any, could not have supplied the deficiency in the prosecution's proof.

The Government was fully aware that its transportation count was shaky. It had every opportunity to offer sound proof on valuation. (*Cf. United States v. Drebin, supra.*) It failed to do so, and from the record that exists, we have reason to believe that evidence to prove that this print of "The Exorcist" was worth $5,000 or more did not exist. The transportation count should be dismissed.

In view of our disposition of the central issues, it is unnecessary to discuss the remaining contentions of the parties.

If the Government is unable to produce proof of the source of Atherton's prints of "Airport," "Young Winston," "Forty Carats," and "The Way We Were," those counts will be subject to dismissal. Atherton is entitled to a new trial on the "Exorcist" count.

REVERSED.