**UNITED STATES of America,**

v.

**SAM GOODY, INC., George Levy and Samuel Stolon, Defendants.**

**Nos. CR 80–507, XCR 80–95.**

United States District Court,
E. D. New York.

Jan. 8, 1981.

E. R. Korman, U. S. Atty. E. D. N. Y., Brooklyn, N. Y. by John Jacobs, Sp. Atty., for plaintiff.

Dewey, Ballantine, Bushby, Palmer & Wood, by Kenneth H. Holmes, New York City, for Sam Goody, Inc.

Lowenthal, Landau & Fischer by Robert E. Fischer/Barry Singer, New York City, for George Levy.

Gold, Farrell & Marks, by Martin Gold, New York City, for Samuel Stolon.

## MEMORANDUM AND ORDER

PLATT, District Judge.

In a sixteen-count indictment filed February 28, 1980, the Government charged Sam Goody, Inc. (hereinafter the "Corporation"), its president, George Levy, and its vice-president in charge of procurement, Samuel Stolon, with various offenses arising from the Corporation's business of buying and selling musical phonograph records, eight track tapes, and cassette tapes. Specifically, that indictment charges that the defendants knowingly defrauded the public, various sound recording companies, and various recording artists and musicians by dealing in unauthorized recordings of copyrighted works.

Last Spring (1980) defendants made several pretrial motions relating to discovery, the conduct of the prosecution, and the legal sufficiency of the indictment. Following a full briefing of the issues and oral argument, the Court made rulings on the discovery motions and reserved decision on the remaining motions. Subsequently, on August 25, 1980, this Court indicated the substance of its rulings on the remaining motions at a conference attended by all parties, [with the understanding that a written opinion would follow. Herewith, that opinion, along with our opinion on other motions.]

## I

## A

### The Original Indictment

The original indictment may be considered to consist of two distinct parts. The first part, consisting of counts 1 through 4, alleges felonies; the second, consisting of counts 5 through 16, alleges misdemeanors. All counts treat the defendants collectively.

Count 1 alleges a violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, in that the individual defendants, in conducting the affairs of the Corporation, engaged in a "pattern of racketeering activity", as that phrase is defined in § 1961(5). "Racketeering activity" is itself defined in § 1961(1) to include, *inter alia*, certain enumerated federal felonies. Count 1 alleges that the underlying felonies for this RICO count are three separate violations of 18 U.S.C. § 2314, interstate transportation of stolen property in the form of counterfeit sound recordings purporting to have been produced and distributed by legitimate recording companies, including CBS, Inc., Casablanca Record and FilmWorks, Inc., Arista Records, Inc., and RSO Records, Inc.

Count I further alleges that the results of this pattern of racketeering activity were fourfold: (1) It was fraudulently represented to the public and to business enterprises dealing in sound recordings that the de-

fendants dealt in legitimate recordings, when in fact a number of such recordings were counterfeit; (2) certain specified recording artists were fraudulently deprived of their rightful royalties and payments; (3) unspecified studio musicians were fraudulently deprived of their rightful income from the sale of the affected recordings; and (4) sound recording companies, including those mentioned above, were fraudulently deprived of their rightful royalties and income.

The alleged felonies underlying the RICO count are embodied in counts 2, 3, and 4. Each of the three counts alleges that the defendants caused to be transported in interstate commerce between Maspeth, New York, and Minneapolis, Minnesota, counterfeit recordings having a value in excess of $5,000. Count 2 alleges one such shipment to have occurred within the period June 9–28, 1978; count 3 alleges the second such shipment during August 2–9, 1978; and count 4 alleges the third during October 17–25, 1978. Each of these shipments is alleged to have amounted to a violation of 18 U.S.C. § 2314, interstate transportation of stolen property, inasmuch as the counterfeit recordings constituted "goods, wares, [or] merchandise" which the defendants knew to have been "stolen, converted, or taken by fraud."

Counts 5 through 16 allege twelve separate acts of copyright infringement, in violation of 17 U.S.C. §§ 106(3) and 506(a), between June 9, 1978, and January 17, 1980. Each of these counts makes reference to a specific sound recording by a well-known musician or group of musicians, released and distributed by one of the legitimate recording companies noted above. In each instance, the allegations of infringement noted the rightful copyright owner.

As indicated above, this Court on August 25, 1980, indicated to the attorneys for the parties herein that if it were called upon to make a decision at that time it would hold that the conduct alleged in counts 2, 3 and 4 would constitute an offense "more closely akin" to the proscription contained in 18 U.S.C. § 2318 than that contained in 18

U.S.C. § 2314. In this connection we noted that the Government, in a Stipulation and Order dated April 15, 1980, agreed to a limitation of the theory of prosecution to a charge of stealing, converting or taking by fraud only insofar as counterfeit labels allegedly were affixed to pre-recorded tapes.

Specifically counts 2, 3 and 4 all charge the defendants with interstate transportation of goods, wares and merchandise,

"knowing the same to have been stolen, converted, and taken by fraud, that is, counterfeit and unauthorized phonorecords of copyrighted sound recordings *which were falsely and fraudulently represented as having been produced, recorded, duplicated and released by the recording companies identified on the labels of said phonorecords.*" (Emphasis added).

Paragraph 9 of the Stipulation and Order reads in full as follows:

"The Government contends and will contend at the trial of this action that with respect to Counts 1 through 4 of the Indictment each of the pre-recorded tapes allegedly transported or caused to be transported between Maspeth, New York and Minneapolis, Minnesota was stolen, converted, and taken by fraud as charged in the Indictment *only in that it was counterfeit in that it was falsely and fraudulently represented as having been produced, recorded, duplicated and released by the recording companies identified on the labels* of said pre-recorded tapes." (Emphasis added).

The Government argues with considerable justification that from the outset of this case these defendants knew that they were charged in Counts 2, 3 and 4 with the illegal transportation in interstate commerce of sounds fixed upon counterfeit phonorecords of copyrighted sound recordings and that it never intended to be limited to proving false labeling in these counts of the indictment. The Government points specifically to the fact that these three counts not only cite 18 U.S.C. § 2314 as the statute alleged to have been violated but that they "parrot" the words of that Section in the heart of the charges themselves and merely add

384

descriptive additions that do not limit the proof that may be offered thereunder. Much the same is true with respect to paragraph 9 of the Stipulation, the Government asserts.

## B

### The Superseding Indictment

■ After a discussion of this question in open Court on August 25, 1980, wherein the Court pointed out that there was nothing to prevent the Government from re-presenting the case to the Grand Jury to obtain a superseding indictment which might be more artfully drawn so as to avoid any question about the nature of the charges, the Government, in an excess of caution, did just that and the new Counts 2, 3 and 4 now charge the defendants with unlawful interstate transportation of goods, wares and merchandise,

> "knowing the same to have been stolen, converted and taken by fraud, that is, the aggregation of sounds fixed upon counterfeit and unauthorized phonorecords of copyrighted sound recordings, which phonorecords were manufactured and distributed without authorization of the copyright proprietors."

Faced with this turn of events, defendants have now moved to dismiss the superseding indictment or, in the alternative, to hold the Government bound by its stipulation. In support of their motion to dismiss they argue that "the superseding indictment represents an abuse of the grand jury system, violates the requirements of due process and should be dismissed pursuant to the Court's supervisory powers over the proceedings before it." Defendant's Memorandum in Support of Motion to Dismiss Superseding Indictment at page 3.

Superseding indictments to cure pleading defects or inartfully drafted charges are not only commonplace but have been held to be perfectly proper, not abusive and not violative of due process. *United States v. Drebin*, 557 F.2d 1316, 1324–25 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). Nothing more or less was intended or accomplished here and as the Court of Appeals said in *Drebin* "[w]e find no merit in any of [the defendants'] contentions." *Id.* at 1325.

The same is true with respect to paragraph 9 of the stipulation as to which the Government has requested to be relieved if there be any question about the extent of its proof under Counts 1 through 4 of the indictment. Since the defendants have known from the outset (and in any event at the very least since the Government filed its opposition papers to their motions addressed to the original indictment) what the Government intended to prove under those counts of the indictment, they cannot claim inadequate notice of the charges, insufficient time to prepare a defense, or any other harmful prejudice. Defendants' argument, that if they had waited until the trial and possibly to the close of the Government's case before advancing their contentions, they would have succeeded on a motion to dismiss and therefore they are prejudiced by reason of having made a pretrial motion, is hypothetical and in all likelihood unrealistic. The probability is that the alleged "variance" between pleading and proof would have surfaced prior to or in the opening statements or during the early stages of the trial and would have at best resulted in a relatively short continuance. In the event it was not raised at such stage, it might well have been deemed to have been waived, given the ambiguity of the language involved. Hence we have no difficulty in granting the Government's request to relieve it of paragraph 9 of its stipulation.

## II

The defendants have also moved for dismissal of the felony counts on the ground that they do not allege facts sufficient to constitute offenses under the applicable statutes. In support of this motion, they have advanced an elaborate argument designed to show that the interstate transportation of counterfeit recordings does not constitute a violation of § 2314, the interstate transportation of stolen property stat-

ute. If we were to accept this argument, counts 2, 3, and 4—the counts based on § 2314—would, of course, have to be dismissed. Importantly, count 1, the RICO count, would also not survive because the § 2314 counts now serve as the predicate for the RICO count. 18 U.S.C. § 1961(1)(B).

In addition, the defendants have asserted a separate argument, directed only against the RICO count. They argue that RICO was never intended to apply to a prosecution of the type here, and its application here would then be inappropriate as a matter of law.

We will address these contentions *seriatim.*

## A

### The § 2314 Counts

Section 2314 provides in pertinent part:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud

* * * * * *

"[s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The defendants have made two separate arguments as to why this section is inapplicable in this case; first, another section exists which should be the sole prosecutorial vehicle for interstate transportation of counterfeit recordings: section 2318 makes the interstate transportation of recordings with counterfeit or forged labels a misdemeanor;[1] second, the intangible "aggregation of sounds" comprising a recorded musical work does not constitute "goods, wares, [or] merchandise" that can be "stolen, converted, or taken by fraud", within the meaning of § 2314, through the act of unauthorized duplication.[2]

In support of the first argument, defendants rely on the legislative history of § 2318, the asserted "plain meaning" of § 2314, and the application of allegedly well-settled principles of statutory interpretation to § 2314. The legislative history of § 2318, the defendants argue, reveals that the section was enacted as an alternative to amending § 2314, in response to a perceived need to provide criminal penalties for trafficking in counterfeits, an area previously covered only by civil copyright law. The legislative decision to enact an entirely new section, with only misdemeanor (amendments) penalties,[3] the defendants contend, reflected recognition that trafficking in counterfeits is essentially an "unfair competition" offense and that the language of § 2314 did not adequately cover such an offense.

Totally apart from the existence of § 2318 and its legislative history, the defendants further argue that the plain meaning of § 2314 precludes its application to counterfeit recordings. The defendants point to a comparison of paragraph one of § 2314 with paragraph three. The former, under which the defendants are charged, refers to items "stolen, converted, or taken by fraud"; the latter refers to "falsely made, forged, altered, or counterfeited securities or tax stamps." This comparison, the defendants contend, shows clear legislative intent to distinguish between "stolen" and "counterfeit" items. And, of course, since the paragraph referring to counterfeits includes only securities and tax stamps, sound recordings are not within its purview. The defendants assert that it is a general principle of statutory interpretation that if Congress has employed one term in a section but has excluded it in another, the term should not be included, *see, e. g., FTC v. Sun Oil Co.,* 371 U.S. 505, 514–15, 83 S.Ct. 358, 364–365, 9 L.Ed.2d 466 (1963), making paragraph one an inappropriate prosecutorial vehicle for any counterfeit item.

1. Defendants Memorandum in Support of Motion to Dismiss Counts One through Four of the Indictment at 3–4.

2. *Id.* at 5–6.

3. 18 U.S.C. § 2318.

Finally, the defendants argue that other generally accepted principles of interpretation of criminal statutes apply here. They contend that where a more specific statute, § 2318, might be construed to relate to the same subject matter as a general statute, § 2314, the specific statute should apply to the exclusion of the general. *See Preiser v. Rodriguez,* 411 U.S. 475, 489–90, 93 S.Ct. 1827, 1836–1837, 36 L.Ed.2d 439 (1973). And, where one statute carries less severe penalties, the principle of lenity should mandate that any ambiguity surrounding which statute applies must be resolved in favor of the less severe statute. *See, e. g., Simpson v. United States,* 435 U.S. 6, 14, 98 S.Ct. 909, 913, 55 L.Ed.2d 70 (1978); *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955).

We reject the defendants' first argument, largely on the basis of the points put forward by the Government in opposition. Although we consider the legislative history of § 2318 somewhat inconclusive, we conclude that sufficient other grounds exist for holding that interstate trafficking in counterfeit recordings need not be prosecuted solely under § 2318. We also reject the defendants' second argument, and we hold that the intangible "aggregation of sounds" comprising a recorded musical work constitutes "goods, wares, [or] merchandise" that can be "stolen, converted, or taken by fraud," within the meaning of § 2314, through the act of unauthorized duplication.

■ Strictly as a matter of statutory interpretation, we find that the mere existence of three distinct criminal statutes under which the defendants could be prosecuted for their alleged conduct here, § 2314, § 2318, and the tandem copyright law provisions, 17 U.S.C. §§ 106(3), 506(a), does not create a requirement that one be used to the exclusion of the others. Examination of the respective statutes shows that each requires proof of a unique set of elements. In this case, § 2314 requires proof of the following: (1) the existence of unauthorized copies of copyrighted sound recordings, (2) having a value of $5,000 or more, (3) transported in interstate commerce by the de-

fendants, (4) with knowledge by the defendants of the "stolen" character (i. e., the unauthorized duplication) of the sound recordings.

On the other hand, § 2318 requires proof of a different set of elements: (1) the existence of sound recordings, whether copyrighted or not, and if copyrighted, whether duplicated with authorization or not, (2) to which are affixed forged or counterfeit labels, (3) transported in interstate commerce by the defendants, (4) with knowledge by the defendants of the forged or counterfeit character of the labels, and (5) with fraudulent intent on the part of the defendants. And the copyright provisions, which underlie counts five through sixteen of the indictment, require proof of the following elements: (1) the existence of copyrighted sound recordings; (2) the unauthorized distribution by the defendants of the copyrighted sound recordings; (3) wilfulness on the part of the defendants; and (4) that the defendants acted "for profit." Even a cursory look at these respective sets of elements reveals important distinctions, not the least of which are the existence of a value provision in § 2314 and not in the others, the physical and legal character of the items involved, and the state of mind of the defendants.

■ It is well settled that overlapping statutes may be used jointly or separately, in the discretion of the prosecutor, where the statutes have distinct elements. Long ago, in considering whether two statutes were mutually exclusive for purposes of the double jeopardy clause of the Fifth Amendment, the Supreme Court stated:

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Gavieres v. United States,* 220 U.S. 338, 342 [31 S.Ct. 421, 422, 55 L.Ed. 489] . . . 'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the

other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'"

*Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), *quoting Morey v. Commonwealth*, 108 Mass. 433 (1871); *see also Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). More recently, the Court has reiterated the above test and has explicitly stated that its "application ... focuses on the statutory elements" of the offenses in question, and that it can be satisfied "notwithstanding a substantial overlap in the proof offered to establish the crimes" proscribed by the respective statutes. *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975); *see Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977).

■ As noted above, the elements required to be proven in § 2314 and § 2318 differ sufficiently to satisfy this test. And because, in our view, they differ so unambiguously we need not resort to the principle of lenity which the defendants have so vigorously urged upon us, nor must we conclude that the arguably more specific § 2318 necessarily excludes the more general § 2314.

Moreover, we need not conclude that § 2318, having been enacted later and being arguably more specific, necessarily precludes application of the more general § 2314 to the conduct alleged here. Simply because § 2318 makes explicit reference to one type of "counterfeiting" related to sound recordings, while § 2314 does not, we cannot infer a legislative intent that § 2318 was to supplant § 2314 in this area. Nothing in the legislative history of § 2318 which the defendants have cited convincingly discloses such an intent, and absent a clear indication to that effect we will not presume it. "It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. ... The intention of the legislature to repeal 'must be clear and

manifest.'" *United States v. Borden*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 188–189, 84 L.Ed. 181 (1939), *quoting Red Rock v. Henry*, 106 U.S. 596, 601–02, 1 S.Ct. 434, 438–439, 27 L.Ed. 251 (1883), (citations omitted); *see also United States v. Green*, 494 F.2d 820 (5th Cir.), *cert. denied*, 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974).

Once we have determined that nothing about § 2318 or the applicable copyright provisions makes either or both of them the exclusive prosecutorial devices for the interstate shipment of counterfeit recordings—counterfeited sounds with counterfeited labels—the next question is whether anything about the language of § 2314 itself or the cases construing it precludes the application of § 2314 to such conduct. To the best of our knowledge, this is an issue of first impression; neither party has cited, nor has our independent research disclosed, any reported cases dealing directly with this precise issue. The resolution of this issue, we suspect, will have important ramifications for future prosecutions in this area. We note the Government's vigorous and repeated assertions about the serious and pervasive nature of trafficking in counterfeits within the recording industry, a practice characterized as an "insidious threat" to "an unsuspecting public." Government's Original Memorandum in Opposition, at 14.

The language of § 2314 indicates that two separate inquiries are involved here: (1) whether the aggregation of sounds taken in violation of the copyright laws, as distinct from the tangible recording tape itself on which the sounds are contained, can be said to constitute "goods, wares [or] merchandise"; and (2) if the answer to the first question is in the affirmative, whether the unauthorized duplication in violation of the copyright laws constitutes a "stealing," "converting," or a "taking by fraud." That these are the critical inquiries is evident from the Government's own statements of its case: "Under the Government's theory, it is the aggregation of sounds (taken in violation of the copyright laws), not the tangible phonorecord itself, that constitutes the stolen 'goods, wares, merchandise;'"

and "[t]he ... prosecution in the instant case is neither based upon nor directed at labels or packaging, but rather at the theft of the sounds themselves, clearly a more prized commodity." Government's Original Memorandum in Opposition, at 3, 5.[4]

■ On their face, the words "goods, wares, merchandise" appear to have been intended to extend broadly to all types of property likely to move in commerce, with no distinction between items of a completely tangible character and items of a mixed tangible-intangible character. This implied standard of commercial mobility is reinforced by the presence of the $5,000 value provision in the statute, a measure clearly premised on the notion that the items intended to be included can be shipped, distributed, and marketed—through the medium of interstate commerce—for the purpose of producing commercial revenue. *See* 18 U.S.C. § 2311 (defining "value" in § 2314 and related sections); *see generally United States v. Drebin*, 557 F.2d 1316, 1331–32 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978); *Cave v. United States*, 390 F.2d 58, 67 (8th Cir. 1968), *cert. denied*, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968).

Judicial construction of § 2314 has consistently focused primarily on the commercial nature of the items involved, with consideration of the tangible or intangible nature of the items a secondary concern. As one Court has stated, "[t]he terms 'goods, wares, merchandise' is a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce." *United States v. Seagraves*, 265 F.2d 876, 880 (3d Cir. 1959). *See also United States v. Berkwitt*, 619 F.2d 649 (7th Cir. 1980); *United States v. Greenwald*, 479 F.2d 320 (6th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973).

We see no compelling reason why the "subject of commerce" test cannot be applied here to bring counterfeit tapes properly within the ambit of "goods, wares, merchandise" in § 2314. Counterfeit tapes are able to be moved, marketed, sold, and traded, both within the industry and between the industry and the public. The reason for this, of course, is the commercial value of the sounds contained in individual tapes. The instrumentality of commercial revenue is the entire entity—the sounds plus the medium of embodiment. The sounds and the tape are thus inseparable in a commercial-value sense; together, they form a single "subject of commerce." Counterfeit tapes, just like legitimate recordings, are "such personal property or chattels," *Seagraves, supra*, 265 F.2d at 880, as are intended to move through the channels of commerce and ultimately come to rest in the hands of the consuming public.

The defendants have made much of the undisputed fact that the actual tapes on which the unauthorized duplications of sounds were placed were not stolen. This fact, however, does not alter our conclusion that once tape and sounds are joined the resulting product is a single entity, and if the more important component, the sounds, can be characterized as "stolen", a question discussed *infra*, the entire entity should be so characterized. The cases support this conclusion. For example, in *United States v. Lester*, 282 F.2d 750 (3d Cir. 1960), *cert. denied*, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961), the Court rejected an argument that copies of stolen geophysical maps did not qualify as "goods, wares, [or] merchandise," as did the actual stolen originals, because the copies were made with physical materials legitimately owned by the defendants. Said the Court: "It is the idea, not its material embodiment, which is valuable." *Id.* 282 F.2d at 755.

Similarly, in *United States v. Bottone*, 365 F.2d 389 (2d Cir.), (Friendly, J.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966), arguably the case most similar to the instant case, the Court upheld a conviction under § 2314 for the interstate transportation of copies of trade secrets, even though the defendants had made the

---

4. As heretofore indicated, the Government claims that this has been its position or theory from the outset of the case and the superseding indictment does no more than clarify this.

copies with their own materials. Judge Friendly wrote that "when the physical form of the stolen goods is secondary in every respect to the matter recorded in them, the transformation of the information in the [originals owned by the owners of the trade secrets] into a tangible object never possessed by the original owner should be deemed immaterial." *Id.*, 365 F.2d at 393–94. Indeed, the Court lent considerable support to the proposition that when an item derives its value from intangible concepts or intellectual property— whether copyrighted or not—contained within it, no theft of the original tangible medium need occur at all; only the intangible component need be taken, and once it is transferred to a physical medium, albeit one legitimately owned by the taker, it becomes a distinct "good," "ware," or item of "merchandise" within the meaning of § 2314.

The Courts of Appeals for the Ninth, District of Columbia, and Seventh Circuits have implicitly accepted this proposition in the context of unauthorized duplication of copyrighted works. In both *United States v. Atherton*, 561 F.2d 747 (9th Cir. 1977), and *United States v. Drebin*, 557 F.2d 1316 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978), the Court upheld convictions under § 2314 where the defendants had transported unauthorized duplicates of copyrighted motion pictures. Although the cases are distinguishable in that the evidence at trial showed that the originals themselves had been stolen first and then used to make copies, it is clear that the court on both occasions concluded that a copy of the original—whether it had been stolen or not—is just as much a "good" as the original because of the intangible nature of the copyrighted property. The *Drebin* court stated flatly: "Copies are considered goods or merchandise for purposes of [§ 2314], *United States v. Seagraves*, [*supra*]." *Drebin, supra*, 557 F.2d at 1332. And in *Atherton, supra*, while the Court reversed the defendant's conviction under § 2314 because the Government failed to show that the $5,000 value limitation had been satisfied, it went on to note:

"Atherton's conviction for transporting a print ... [in] violation of 18 U.S.C. § 2314 raises some interesting, almost metaphysical, legal issues. The most intriguing question is whether the intangible idea protected by the copyright is sufficiently reified by being embodied on a film that the copyright becomes 'goods, wares, or merchandise' within the meaning of Section 2314. That question has been resolved against Atherton in *United States v. Drebin* .... "

*Atherton, supra*, 561 F.2d at 752. Underlying the statements in both these cases was the belief that any copy, whether authorized or not, brings a copyrighted work "to life"—in the commercial sense as well as the artistic. Thus, all copies should be treated as "goods" for the same reason the original embodiment is. If a copyrighted original is stolen and transported across State lines, it is prosecutable under § 2314; the same conduct with unauthorized copies should be so as well, by this reasoning.

*United States v. Whetzel*, 589 F.2d 707 (D.C.Cir.1978), also appears to support the Government's theory of prosecution here, at least indirectly. The Court reversed a § 2314 conviction for transportation of unauthorized duplicates of copyrighted sound recordings, but solely on the ground that the $5,000 value threshold had not been established, as in *Atherton, supra*. Had it not been for the value issue, the Court would have had little difficulty with the issue presented here:

"We do not doubt that criminal copyright infringement may be the underlying crime in a § 2314 violation. See *United States v. Atherton [supra]* ... [and] *United States v. Drebin [supra]* .... "

*Whetzel, supra*, 589 F.2d at 710 n. 10. The statement is dictum, to be sure, but it represents the categorical conclusion of at least one Court which has had the occasion to consider the question, however indirectly.

The most recent case is *United States v. Berkwitt*, 619 F.2d 649 (7th Cir. 1980), in which the Court affirmed convictions under § 2314 and the applicable copyright laws for

the "manufacture and interstate distribution of counterfeit tapes." *Id.*, at 658. The Court stated:

> "The decision of which market valuation method to use in this case is complicated by the fact that most prior cases have involved the interstate transportation of stolen property that was tangible. *In the present case, on the other hand, the physical objects transported were tapes which the appellants had legally acquired, and the stolen materials were the sound waves which had been transferred to the tapes.* There, the valuation methods used in the more traditional 'garden variety' § 2314 prosecutions are not necessarily applicable here, and vice versa."

*Id.*, at 657 (emphasis added).

On the basis of the foregoing, we are satisfied that the first inquiry arising from the language of § 2314 can be answered in the affirmative in this case: unauthorized duplicates of copyrighted sound recordings are "goods, wares, [or] merchandise" as those terms have been construed and are commonly understood.

■ The second inquiry, whether these "goods" are capable of being "stolen, converted or taken by fraud," presents slightly less difficulty, and can also be answered affirmatively. The above-quoted statements of the courts in *Whetzel, supra,* and *Berkwitt, supra,* of course, demonstrate implicit acceptance of this proposition as a natural consequence of the assumption that unauthorized duplicates of copyrighted works are "goods." The court in *Drebin, supra,* was more emphatic: "Moreover, illicit copying of a copyrighted work is no less a 'theft, conversion, or taking by fraud' than if the original were so taken. *See United States v. Bottone* [supra]." *Drebin, supra,* 557 F.2d at 1332.

Even without these few cases dealing most closely with the situation in the instant case, we are persuaded that the terms "stolen, converted or taken by fraud" were intended to broadly cover all forms of wrongful taking. "The decisions were numerous that the words 'stolen' and 'convert-ed' cover a broad range of wrongful acts." *United States v. Plott,* 345 F.Supp. 1229, 1231 (S.D.N.Y.1972). For example, the Supreme Court some time ago said the following about the proper scope of conversion:

> "Conversion ... may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for a limited use."

*Morissette v. United States,* 342 U.S. 246, 271–72, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1951). Even earlier, the Court of Appeals for this Circuit has commented on the intended breadth of all the pertinent terms:

> "We think it clear that the National Stolen Property Act [the forerunner of the current § 2314), which then read 'stolen, feloniously converted, or taken feloniously by fraud or with intent to steal or purloin.'] was not restricted to the transportation of property taken larcenously. . . . In our opinion the statute is applicable to any taking whereby a person dishonestly obtains goods ... belonging to another with the intent to deprive the owner of the rights and benefits of ownership."

*United States v. Handler,* 142 F.2d 351, 353 (2d Cir. 1944).

More recently, the Fifth Circuit Court of Appeals took a similarly broad view of "stolen", finding that the term embraces embezzled property. The Court noted that all three terms, "stolen," "converted," and "taken by fraud", must be interpreted to effectuate the legislative purpose of § 2314:

> "The aim of the statute is, of course, to prohibit the use of interstate transportation facilities for goods having certain unlawful qualities. This reflects a congressional purpose to reach all ways by which an owner is wrongfully deprived of the use or benefits of the use of his property. . . . Congress by the use of broad terms was trying to make clear that if a person was deprived of his prop-

erty by unlawful means amounting to a forcible taking or a taking without his permission, by false pretense, by fraud, swindling, or by a conversion by one rightfully in possession, the subsequent transportation of such goods in interstate commerce was prohibited as a crime." *Lyda v. United States,* 279 F.2d 461, 464 (5th Cir. 1969). The apparent Congressional purpose has even allowed the use of the terms to extend to a conviction under § 2314 where the underlying offense was the "poaching" of alligators in violation of Georgian law. *United States v. Plott, supra,* 345 F.Supp. 1229 (S.D.N.Y.1972).

In sum, the courts seem uniformly to have adopted the view that "the issue as to whether the goods were obtained by one of the unlawful methods of acquisition referred to in the statute is not to be decided upon the basis of technical common law definitions," *Bergman v. United States,* 253 F.2d 933, 935 (6th Cir. 1958), but rather on a broad common-sense basis encompassing all forms of wrongfully depriving an owner of the possession or use of his property. In our view, criminal copyright infringement in the form of making unauthorized duplication of copyrighted musical works easily qualifies as a stealing, converting, or taking by fraud under this approach. Such conduct most closely resembles traditional conversion, in that it involves the unauthorized appropriation of property belonging to another party after the property had been lawfully given to the infringer for a limited use, and the requisite intent on the part of the infringer to put the property to his own use and for his own benefit. But we need not limit it to conversion, and find that such conduct qualifies equally as a stealing or a taking by fraud, as the above case law has construed those terms. Criminal copyright infringement is a form of wrongful taking, and the cases have required no more specificity than that.

We conclude, therefore, that the language of § 2314 and the reported cases allow the characterization of the act of duplicating copyrighted aggregations of sounds without authorization as a stealing, converting, or taking by fraud of goods, wares, and merchandise. Consequently, violations of § 2314 are properly alleged in the indictment and we are compelled to deny the defendants' motion to dismiss counts 1 through 4 on this basis.

## B

### *The RICO Count*

■ Defendants also contend that the first count of the indictment, which alleges a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), should be dismissed because RICO was designed to deal only with the infiltration of organized crime into legitimate business. The Government, for its part, argues that the scope of RICO is not so limited.

Defendants have been charged with violations of 18 U.S.C. § 2314. As specifically outlined in 18 U.S.C. § 1961, such violation may be the basis for a "RICO" prosecution. To argue, as defendants do, that they cannot be subject to such a prosecution because they are not members of organized crime is patently without merit. Granting that the primary aim of the Act is to inhibit the infiltration of organized crime into legitimate business enterprises, it has long been recognized that that is not the sole aim of RICO. As the Ninth Circuit Court of Appeals wrote "The words of the statute are general. They contain no restriction to particular persons." *United States v. Campanale,* 518 F.2d 352, 364 (9th Cir. 1975). Furthermore, our own Circuit has indicated, in explicating the statute, that the words of the Act do not so limit the types of organizations or persons subject to a RICO prosecution: "Title IX in its entirety says in clear, precise and unambiguous language—the use of the word 'any'—that all enterprises that are conducted through a pattern of racketeering activity ... fall within the interdiction of the Act." *United States v. Altese,* 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). See also *United States v. Huber,* 603 F.2d 387, 394 (2d Cir. 1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63

L.Ed.2d 459 (1980) (Act "shall be literally construed to effectuate its remedial purposes.") Consequently, we cannot agree with defendants on this point and hold that they are proper subjects of a RICO prosecution.

## III

### Prosecutorial Misconduct

The defendants have also moved for dismissal of the entire indictment on the ground of prosecutorial misconduct. Their two principal contentions in this regard are that (1) the "sting" operation conducted by the FBI, which gathered early and critical evidence in this and related prosecutions,[5] was an improper exercise of law enforcement authority which so tainted all that followed that the indictment must be dismissed as a matter of fairness; and (2) the Government acted improperly in surreptitiously obtaining and recording a statement by defendant Stolon to an undercover informant prior to Stolon's indictment. The defendants have also sought a hearing on these allegations—and others which they argue further demonstrate a pattern of governmental impropriety[6]—in the hope that this Court would be persuaded that dismissal of the instant indictment is a necessary sanction to deter similar improper prosecutorial conduct in the future.

■ We deny the defendants' request for a hearing and disagree with their contention that all their allegations, even if proven, would necessitate dismissal of the indictment. Simply stated, we do not subscribe to the theory that any and all types of prosecutorial impropriety—again, assuming the same to be proven—are to be rectified by dismissal of the affected indictment. Dismissal is a drastic sanction, to be applied only when the interests of an ordered society clearly require it and when no narrower means exist to protect defendants from informers and to discourage questionable governmental practices in the future. See

United States v. Broward, 594 F.2d 345 (2d Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); United States v. Brown, 602 F.2d 1073 (2d Cir.), cert. denied, 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979); United States v. Fields, 592 F.2d 638 (2d Cir. 1978), cert. denied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). The best example of this principle, of course, is the operation of the exclusionary rule, which mandates the inadmissibility of evidence garnered as a result of violations of a defendant's Fourth, Fifth, or Sixth Amendment rights. The exclusion of tainted evidence—not outright dismissal of the indictment—has long been held to be the appropriate protective and prophylactic mechanism. This considered judgment balances the interests of society against those of defendants entitled to procedural fairness, and achieves the best accommodation of the two. See Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1975); United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1975); United States v. Hunter, 550 F.2d 1066 (6th Cir. 1977).

In the instant case, where the defendants have alleged no specific prejudice accruing to them from either of their above-mentioned major contentions, dismissal of the indictment would be particularly inappropriate. Even if specific prejudice had been alleged, we presently see no basis for applying even the less drastic sanction of suppression of any of the evidence gained by the Government through either the "sting" operation or the surreptitious recording of Stolon's statements. Nonetheless, we make the following brief observations about the two major allegations of the defendants, noting that adequate bases exist for disposing of both of them as a matter of law.

■ The FBI established and maintained a retail record store in Westbury, Long Island, named "Modular Sounds", to serve as a front for undercover operations direct-

---

5. See, e. g., United States v. Tucker, 495 F.Supp. 607 (E.D.N.Y.1980).

6. Defendants Memorandum in Support of Motion to Dismiss Indictment for Prosecutorial Misconduct at 1–4.

ed against suspected criminal activity in the music recording industry. The specific purpose of the undercover business, as the Government describes it, was "to combat the large-scale and illegal manufacture, interstate transportation and retailing of counterfeit and printed sound recordings, some of the proceeds of which were invested in other illegal enterprises." Government's Memorandum in Opposition to Defendants' Motion to Dismiss the Indictment for Prosecutorial Misconduct, at 4. In an earlier opinion in a related case, this Court had occasion to consider this operation and intimated that it was a proper exercise of investigative activity. *United States v. Tucker*, 481 F.Supp. 182, 191 (E.D.N.Y.1979) (Platt, J.). We now expand on that intimation and state that the "Modular Sounds" operation was a permissible means of investigating reasonably suspected criminal activity. Absent entrapment, "sting" operations of this kind do not exceed recognized bounds of investigative discretion. *See United States v. Brooks*, 567 F.2d 134 (D.C. Cir.1977).

Inasmuch as the defendants have not alleged entrapment—indeed, the defendants have failed to demonstrate that the Government's involvement in "Modular Sounds" led inexorably to the instant indictment—it is unnecessary for us to consider the cases they proffer in support of their argument that the Government itself was overly involved in the alleged crimes. *See United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (entrapment defense *not* available where Government agent merely supplied defendant with essential ingredient in manufacture of illegal drug); *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) (convictions reversed when illegal manufacture of controlled substances was *suggested* and *arranged* by Government agents); *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973) (convictions under Travel Act, 18 U.S.C. § 1952, reversed when Government agents themselves supplied necessary interstate element). These cases all involved allegations of direct Government creation of the crimes alleged in the respective indictments, and

entrapment. None of these situations, of course, obtain here for the "Modular Sounds" operation did not instigate, suggest or arrange the purported criminal activity nor did it supply a necessary element of the crime. Rather, the "sting" operation merely provided an outlet for the already stolen sound recordings.

■ The propriety of the surreptitious recording of the Stolon statement by a confidential informant equipped with a concealed body recorder can similarly be established briefly. We note that the defendants do not seek to suppress the statement, raising the inference that it was at least partially exculpatory, but rather point to its acquisition as "yet another example of the prosecution's unbridled zeal and insensitivity to the defendants' rights to due process." Defendants' Memorandum of Law in Support of Motion to Dismiss Indictment for Prosecutorial Misconduct, at 27. More specifically, defendants assert that the statement was obtained in violation of Stolon's Sixth Amendment right to counsel and that this case is "constitutionally indistinguishable" from *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Defendant's Memorandum, at 25.

The defendants miss the point. This case is indisputably *factually* distinguishable from *Massiah, supra*, in one critical respect. In reversing the conviction of a defendant from whom inculpatory statements had been deliberately and surreptiously elicited by an agent of the Government after the defendant's arrest and indictment, the Court in *Massiah* expressly predicated its decision on the conclusion that the statements had been made at a "critical stage" of the prosecution, thereby triggering the defendant's right to counsel, because they had been made after indictment. 377 U.S. at 205–6, 84 S.Ct. at 1202–1203. In the instant case, it is uncontroverted that adversary prosecutorial proceedings had not yet commenced against Stolon or the other defendants at the time Stolon's statement was elicited and recorded; the indictment was returned a full month after Stolon's statement was made, and he has never been

formally arrested. In short, Stolon's un-counseled statement did not occur at a "critical stage" of the prosecution, the benchmark for the Sixth Amendment's right to counsel. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). It is thus immaterial that the Government knew at the time that Stolon had an attorney and that the attorney had previously been advised that Stolon was a target of a grand jury investigation.

The Supreme Court and the Court of Appeals for this Circuit have both recently reaffirmed that indictment—or arrest, if it occurs prior to indictment—is the critical moment after which the strictures of *Massiah, supra*, and its progeny apply. In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court upheld the reversal of the defendant's conviction on Sixth Amendment grounds where the prosecution had "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel." *Id.* at 274, 100 S.Ct. at 2189. Critical to the Court's holding was its characterization of the setting for the statements as "post-indictment confrontations between government agents and the accused"; the third of three "important factors" was that "Henry was in custody and under indictment at the time he was engaged in conversation by [the Government informant]." *Id.* at 270, 100 S.Ct. at 2186. In view of the fact that Stolon was neither under indictment nor in custody at the time he made his statements to the Government informant, we are not able to conclude that defendants have "show[n] that the government engaged in conduct that, considering all the circumstances, [was] the functional equivalent of interrogation," so as to trigger Stolon's right to counsel. *Id.* at 277, 100 S.Ct. at 2190 (Powell, J., concurring). *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Similarly, in *United States v. Mohabir*, 624 F.2d 1140 (2d Cir. 1980), the Court of Appeals severely circumscribed the ability of the prosecutors themselves to question indicted defendants prior to their arraign-ments, but took great care to "underscore[ ] the difference between questioning a defendant before and after indictment." *Id.* at 1148; *see Carvey v. LeFevre*, 611 F.2d 19 (2d Cir. 1979). Echoing the critical distinction noted by the Supreme Court in *Massiah, supra*, through *Henry, supra*, the Court stated: "Once criminal proceedings have been formally instituted against a defendant—as they were here by the filing of the indictment—the need for counsel is particularly acute." *United States v. Mohabir, supra*, at 1148. The Court concluded that "[t]he indictment thus marks a crucial point for the defendant; it also marks the point after which any questioning of the defendant by the government can only be 'for the purpose of buttressing . . . a *prima facie* case.'" *Id.* at 1148, *quoting People v. Settles*, 46 N.Y.2d 154, 163, 412 N.Y.S.2d 874, 385 N.E.2d 612 (1978). In this case, we reiterate, defendant Stolon had not yet reached this "crucial point" when confronted by the Government informant wearing a concealed recording device.

In light of the above, we conclude that the government did not violate Stolon's right to counsel guaranteed by the Sixth Amendment and thereby did not commit any misconduct calling for the imposition of sanctions by this Court, in the form of dismissal of the indictment or otherwise.

## IV

Defendants had also filed a motion alleging that the government was misusing the grand jury as a discovery device to obtain further evidence against them instead of using it to investigate other criminal activity. This issue was fully briefed by all parties in June of last year and after reading the briefs and all the grand jury testimony, we indicated, from the bench, that there was no reason, at that time, to believe that such abuse was taking place. We did, however, order the government to continue to produce relevant grand jury transcripts so we could monitor the situation. We have been informed that there have been no further relevant grand jury proceedings and

consequently can now rule that there was no such misuse of the grand jury process and deny all of the defendants' motions relating to this issue.

## V

In summary:

(1) Defendants' motion to dismiss counts 1 through 4 of the indictment on the ground of legal insufficiency is hereby denied;

(2) Defendants' motion to dismiss the entire indictment on the ground of prosecutorial misconduct is also hereby denied; and

(3) Defendants' motion to suppress testimony and evidence obtained by the government's alleged misuse of the grand jury is also hereby denied.

SO ORDERED.